[Nos. H026757, H027383. Sixth Dist. Dec. 21, 2005.]

AJAXO INC., Plaintiff and Appellant, v.
E*TRADE GROUP INC., et al., Defendants and Appellants.

**Counsel**

Ropers, Majeski, Kohn & Bentley and Susan H. Handelman for Plaintiff and Appellant.

Steefel, Levitt & Weiss, Michael J. Lawson, Mark Fogelman, Joseph E. Floren, Brian T. Hafter and Rebecca M. Hoberg for Defendant and Appellant E*Trade Group, Inc.

Pillsbury Winthrop, William F. Abrams, Kevin M. Fong and Jason McDonell for Defendant and Appellant Everypath, Inc.

**Opinion**

**ELIA, J.—**

*Introduction*

Following a seven-week trial, on April 22, 2003, a jury found that E*Trade Group Inc. (E*Trade) had breached a mutual nondisclosure agreement it had with Ajaxo Inc. (Ajaxo) by disclosing protected information to Everypath Inc. (Everypath).[1] The jury assessed $1.29 million in damages against E*Trade for breach of the nondisclosure agreement.

---

[1] Formerly, Everypath was known as Webonphone or Webbyphone. For clarity in this appeal, we will use the name Everypath for all the different iterations of the company.

In addition, the jury found that Ajaxo was the owner or licensee of a trade secret. The jury found that E*Trade disclosed that trade secret to Everypath without Ajaxo's consent, and that E*Trade knew or had reason to know that E*Trade's knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use. The jury determined that Ajaxo proved by clear and convincing evidence that E*Trade acted willfully and maliciously in misappropriating Ajaxo's trade secret.

As to Everypath, the jury found that Ajaxo proved that Everypath acquired and used Ajaxo's trade secret without Ajaxo's express or implied consent. Furthermore, the jury found that Ajaxo proved that Everypath knew or had reason to know that Everypath's knowledge of the trade secret derived from or through a person who owed a duty to Ajaxo to maintain its secrecy. Moreover, the jury found that Ajaxo proved by clear and convincing evidence that Everypath acted willfully and maliciously in misappropriating Ajaxo's trade secret.

### Issues on Appeal

*E*Trade's Issues on Appeal*

E*Trade raises three issues on appeal. First, E*Trade contends that some of the court's evidentiary rulings deprived E*Trade of its right to a fair trial. Second, the court erred in denying E*Trade's motion for judgment notwithstanding the verdict. Finally, the court abused its discretion in finding that Ajaxo was the "prevailing party" under Civil Code section 1717.

*Ajaxo's Issues on Appeal*

Ajaxo raises five issues on appeal. First, Ajaxo contends that the court erred in granting E*Trade's and Everypath's motion for nonsuit on damages for E*Trade's and Everypath's misappropriation of Ajaxo's trade secret. Second, the court erred in granting E*Trade's and Everypath's motion for nonsuit on Ajaxo's claim for a reasonable royalty. Third, the court's erroneous grant of nonsuit on damages deprived Ajaxo of an award of exemplary damages. Fourth, the trial court erred in denying Ajaxo injunctive relief. Finally, the court erred in failing to award attorney fees for pretrial work.

*Everypath's Issues on Appeal*

Assuming that this court finds merit in any of Ajaxo's contentions on appeal, Everypath raises the following issues. First, Everypath contends that the court erred in denying its motion for judgment notwithstanding the verdict (JNOV) on the jury's findings that Everypath had willfully and maliciously misappropriated Ajaxo's trade secret and that Everypath authorized or ratified the willful and malicious misappropriation of Ajaxo's trade

secret. Second, Everypath contends that the court's evidentiary rulings denied Everypath its right to a fair trial.[2]

We find merit in Ajaxo's first issue on appeal. Accordingly, we reverse and remand this case to the lower court for a new trial on damages for E*Trade and Everypath's misappropriation of Ajaxo's trade secret.

We set forth in detail the evidence adduced in the trial.

*Facts and Trial Testimony*

*Ajaxo and E\*Trade*

The name "Ajaxo" stands for "Advanced Java Architecture for Extensible Objects." Sing Koo formed Ajaxo to market a sophisticated stock trading technology called "Wirelessproxy XO," the development of which was completed by April 1999. Ultimately, among other things, Koo's Wirelessproxy XO technology allowed its users to buy and sell stock over the Internet using wireless devices, including the new Web-enabled wireless phones.

In 1999, Ajaxo was a small six-person company headed by its sole shareholder and investor, Koo. Koo's wife, Connie Chun, was Ajaxo's Director of Marketing. As such, she managed the marketing side of the business.

In early September 1999, Chun sent a marketing e-mail to E*Trade. She received a reply from Dan Baca, a senior engineer at E*Trade, on September 10, 1999. Jerry Gramaglia, Chief Marketing Officer at E*Trade, had asked Baca to find a wireless system to allow E*Trade to participate in the Sprint Internet phone launch. Baca testified that E*Trade wanted to be competitive in "the wireless space" and provide wireless access and trading. Baca emphasized to Ajaxo that E*Trade needed to "beta test"[3] wireless stock trading on Sprint phones using hand-held device markup language (HDML)[4] by October 15, 1999.

On the same day as Baca contacted Chun, E*Trade provided Ajaxo a mutual nondisclosure agreement (NDA). Under the terms of the NDA, Ajaxo

---

[2] Pursuant to California Rules of Court, rule 13(a)(5), Everypath adopts by reference pages 22–31 of E*Trade's opening brief.

[3] "Beta testing" involves testing an early version so that any flaws or "bugs are detected and corrected."

[4] At this time, Sprint phones could handle only HDML.

and E*Trade promised to take all precautions to protect the other's "proprietary information" and hold it confidential. The NDA defined "proprietary information" as "including, without limitation, trade secrets, patents, patent applications, copyrights, know-how, processes, ideas, inventions (whether patentable or not), formulas, computer programs, databases, technical drawings, designs, algorithms, technology, circuits, layouts, designs, interfaces, materials, schematics, names and expertise of employees and consultants, any other technical, business, financial, customer and product development plans, supplier information, forecasts, strategies and other confidential information . . . ."

The NDA described the penalties for breach of the agreement. In addition, it required immediate notification if one party believed the other might have released proprietary information. Chun signed the NDA on September 10, 1999, and faxed it to E*Trade the same day.[5] Thereafter, Baca sent two pages of functional specifications to Chun detailing E*Trade's wireless trading requirements. Chun reviewed the specifications and called Baca. Baca wanted to know if Ajaxo could meet the October 15 deadline for beta testing. Chun told Baca that she thought they could, but would let him know after she had spoken to the "technical side."

In response to Baca's request for a technical paper, Chun sent E*Trade a "white paper" overview of the Wirelessproxy XO technology. Over the weekend of September 11–12, 1999, Koo built a prototype application specifically for E*Trade using the Wirelessproxy XO technology "to deliver a look and feel according to [E*Trade's] functional specification." On Sunday, September 12, Chun informed Baca by e-mail that they were ready to demonstrate their technology.

The next day, Koo and Chun met with Baca and others at E*Trade. Koo was told that a few people wanted to view the demonstration. Accordingly, rather than using a wireless phone, Koo used a phone emulator[6] on a notebook computer to show the operation of his technology. Koo explained that this was because the screen is bigger than a phone screen.

Koo had a personal E*Trade account. Thus, he used his own E*Trade user identification number and his personal E*Trade password to access E*Trade's Web site in the demonstration. Then, Koo entered a personal identification number (PIN code) to access the Ajaxo computer through which the Wirelessproxy XO technology works. Koo utilized the PIN code to protect the Ajaxo system from unauthorized access.

---

[5] The signature of Pamela Kramer, an E*Trade Vice-President appears on the NDA. She confirmed that she signed the document around September 10th.

[6] A phone emulator is a program that imitates a phone browser. It allows the user, on a computer, to do things that someone using a phone might do.

After Koo and Chun demonstrated that they could complete a stock trade, they logged off and allowed some of the E*Trade personnel to enter their own E*Trade accounts. When it came to entering the Ajaxo PIN code, the E*Trade personnel were not allowed to enter it. Koo entered the code.[7] After Koo entered the Ajaxo PIN code, E*Trade personnel entered the E*Trade Web site wirelessly through Ajaxo's technology. Chun described the E*Trade personnel as excited at seeing the Ajaxo demonstration.

The E*Trade engineers asked numerous questions. Koo explained to the E*Trade group that his special type of wireless proxy server operates between the E*Trade Web site and the wireless gateway (the server for the wireless device). Using drawings and diagrams, Koo explained how the technology worked and answered many questions from the E*Trade engineers. Koo testified that a proxy server is nothing new, but his proxy is a "superproxy." Koo used an analogy to describe in general terms the function served by his superproxy. He analogized it to comparison shopping where one sees a product and wants three price quotes. Using one hand-held device, his system can go to three Web sites, obtain three price quotes, extract data from complicated screens with pictures and graphics, and deliver three quotes to the small mobile device. Thus, Koo explained that his Wirelessproxy XO established "sessions" with servers and delivered select bits of information to small screens.

As Koo explained his technology, he answered E*Trade's more probing questions about such things as "buffering the cookie" and "how to sustain the session." He explained "initialization" and "destruction of a session." The E*Trade engineers asked about Koo's operating platform, the use of different languages, load balancing, number of transactions and other matters. Koo explained the software and its object-oriented architecture.

During the meeting, Pamela Kramer complained that the log-on procedure was cumbersome and asked Koo to develop a log-on system using four digits. Kramer asked Koo to change the E*Trade application to allow users with multiple accounts to switch accounts.

On September 14, 1999, Koo made the changes that E*Trade had requested. The next day Chun called Baca to offer a second demonstration. Koo and Chun arrived at E*Trade that day for another interactive meeting armed with various wireless devices. Koo demonstrated the four-digit login feature.

---

[7] Both Koo and Chun testified that they entered the code.

He had tied a four-digit PIN code to a database that included his personal E*Trade user name and password in order to access his proxy server.[8]

Baca asked Koo how he had created the login system. Koo explained to Baca the automatic filing of a form by use of the four-digit PIN code. Baca said that he was not familiar with this automatic form-filling process and asked Koo for the PIN. Koo refused to give Baca the PIN code, because it was tied to Koo's personal E*Trade account. Koo entered the code, however, and then held up a phone showing four asterisks (\*\*\*\*).

Subsequently, Koo and Chun had another meeting with Baca during which there were other technical discussions. At another meeting, E*Trade inquired whether Ajaxo was looking for a "venture partner." Ajaxo responded that it was not, but proposed terms for E*Trade's use of Ajaxo's technology. Ajaxo's total price for use of its Wirelessproxy XO was $860,000.

On September 30, 1999, Chun received an e-mail from Baca with some revised functional specifications. Baca continued to pose technical questions, which Ajaxo answered.

The product manager for E*Trade's wireless application on the business side, Joe Raymond, telephoned Chun on October 12, 1999. He stated that E*Trade was considering putting their customers on the Ajaxo platform, but E*Trade needed to "have some more in-depth technical conversation so as to ascertain if it would be fair and befitting to put [E*Trade] customers on their platform." At this time, Raymond knew Ajaxo had successfully demonstrated its capabilities and no other vendor had demonstrated trading capability on a wireless phone. Raymond testified that E*Trade needed even more information because if the system ever failed, E*Trade's engineers would have to "troubleshoot." Chun told Raymond that Ajaxo preferred to have an agreement in place before there were more "technical discussions."[9] Raymond told Chun that he was working with his in-house attorneys to prepare a counterproposal in response to Ajaxo's initial proposal.

During the phone call to Chun, Raymond set an October 15 meeting date for E*Trade to obtain more information. Raymond indicated to Chun and Koo that he would be present at the October 15 meeting. Believing that a contract was soon to be forthcoming, Koo prepared for what he thought was a "technology transfer" meeting because of the "very tight timetable." Koo

---

[8] Koo testified, "[E]ffectively, [it] is as if you have entered three fields except you only enter a short pin code."

[9] Koo testified at trial that he was listening to the conversation between Raymond and Chun on a speakerphone.

printed out from his server a hard copy of the E*Trade prototype programming information. In addition, he used a "Java doc utility" to generate a Java document containing all the "interfaces" that were used in the prototype program. Koo created two binders. One binder contained biographical information about Koo, including his background and his experience. The other binder contained technical information, plus diagrams illustrating the workings of Ajaxo's technology.

At the October 15 meeting, Koo and Chun expected Raymond to appear with a contract or a counterproposal. Instead, Baca showed up with Dan Miley and Guy Albanese.[10] Baca wanted more information about "user interfaces" and how Ajaxo built an application program. In addition, Baca wanted to know about "data transfers" from a large page to the small screen. Among other things, Baca posed questions about "device output," the "cache," and "commentator." Koo and the E*Trade personnel engaged in a "deeper level" discussion of the Wirelessproxy model. Koo explained to Baca how the Wirelessproxy XO could overcome problems with the phone memory. According to Koo, at no time did Baca express dissatisfaction with the answers that Koo provided. Baca asked for a copy of Koo's technical binder. Koo explained, however, that he had prepared only one copy, which he could not give up.

On October 18, Raymond told Chun that Baca needed the technical binder and that a contract was "in the work[s]." The same day, Koo and Chun drove to E*Trade and gave the technical binder to Baca. Baca made a copy of the technical binder and returned the original to Koo.

By October 18, Koo had had five face-to-face meetings with E*Trade in which he had explained his technology. As a result, according to Koo, E*Trade had sufficient information to implement Koo's Wirelessproxy XO technology.

In October 1999, Koo performed some maintenance on the security system for the Ajaxo server. He noticed that there had been 16 unauthorized entries into Ajaxo's computer. All of these unauthorized entries used the four-digit PIN code Koo had created for the E*Trade demonstration. All the intrusions into the Ajaxo computer occurred between September 15 and September 19, 1999. Subsequently, Koo reported the unauthorized access to the "FBI High-Tech Squad" and the "Security Exchange Commission."

---

[10] Dan Miley was a consultant working at E*Trade. At this time, Guy Albanese was "Executive Producer for Marketing and Development for [E*Trade's]" phone-based trading system. Initially, he reported to Pamela Kramer. Eventually, he reported to Jerry Gramaglia.

In March 2002, Koo learned that Baca had the four-digit PIN code and had provided it to other members of the E*Trade technical team.[11] Baca admitted that he had used and given other members of the technical team the four-digit PIN code. In addition, he admitted that he used a phone "emulator"[12] to access Ajaxo's system.[13]

On October 27, E*Trade gave Ajaxo a "letter of intent" stating that it would pay "XXX" for the Wirelessproxy XO technology. Raymond said that the XXX would be specified in a forthcoming formal agreement. E*Trade issued a new document on October 28 entitled "Memorandum of Terms." E*Trade proposed to pay Ajaxo $100,000 upon signing the letter of intent and $100,000 on December 29, 1999, at the end of the development phase. Finally, there was an option to pay $200,000 per "device platform."[14] Koo and Chun agreed to E*Trade's terms and wanted to sign the agreement. Raymond told them that the document needed to be printed on E*Trade letterhead and that it would be ready for signing the next morning.

When Koo returned to E*Trade the next day, he met with Pamela Kramer. Kramer told him that she did not have enough in her budget to meet the terms of the contract and needed to discuss it with her boss. She told Koo and Chun she would visit Ajaxo on November 5, 1999.

When Kramer and Raymond visited Ajaxo on November 5, Kramer told Koo and Chun that E*Trade had decided not to do business with Ajaxo. According to Koo, Kramer told him that Ajaxo was too small to be an E*Trade partner and that since she had learned about the Ajaxo technology she was ready to go out and find somebody in a different league to implement it. According to Chun, Kramer said that with the technology E*Trade had learned from Ajaxo, E*Trade could have another vendor in a different league do the wireless application.

Pursuant to the terms of the NDA, Chun wrote to the chief executive officer (CEO) of E*Trade about what had occurred and Ajaxo's concerns about the threatened misappropriation of Ajaxo's technology.

---

[11] Koo attended Raymond's deposition. Raymond identified a document (exhibit 166) that indicated that Baca had provided the E*Trade technical team the Ajaxo four-digit PIN code.

[12] As noted, a phone emulator is a program that imitates a phone browser. Significantly, it allows the user to see "information" flowing back and forth, including viewing the "instructions" coming to the phone.

[13] At trial, Baca asserted that Chun had provided him the four-digit PIN code. However, he could not recall how the information had come to him. Chun vehemently denied that she had given the PIN code to Baca.

[14] Koo understood this to mean that Ajaxo would receive $200,000 for the technology to work on a Sprint phone, $200,000 for the technology to work on other types of phones and $200,000 for technology to operate on data devices such as the Palm VII.

*Everypath*

During 1998 and part of 1999, Everypath's focus was on accessing the Internet with "regular voice telephones." The Everypath "voice enabling system" aimed to transmit text from a Web site, which was then translated into a voice on a telephone. Around May 1999, Everypath was in contact with E*Trade about developing a demonstration for E*Trade of Everypath's voice application.

In the fall of 1999, Everypath learned from Guy Albanese at E*Trade that Everypath's "chances of getting funded by E*Trade would be better if [Everypath] moved from a voice product to a data product." Moreover, Albanese told Everypath that E*Trade was "leaning more towards data access than voice access of the Internet."

In all of 1999, Everypath had no customers for its voice product. Thus, in the fall of 1999 Everypath shifted in orientation toward data access and left behind the voice product. However, before the switch from voice to data, in the September/October timeframe, Everypath "did not have a product . . . didn't have the business . . . didn't have a team."

The day after Baca met with Koo and Chun for Ajaxo's second demonstration of its technology, where technical discussions took place about such things as "cookies," Baca met with Everypath personnel. Guy Albanese referred Everypath to Baca. On the same day, an Everypath employee by the name of Prasad Krothapalli[15] sent an e-mail message to Piyush Goel, one of Everypath's founders, in which he outlined assignments for his group members. One of the assignments for an employee by the name of Roopak was "support for session specific cookies with HTTPclient, (one week)." Long-term assignments for Roopak included "support for user name and password," "persistent cookies," "bug fixing" and "infrastructure for data cleansing support."

Baca left E*Trade in December 1999 and started work at Everypath on December 15, 1999.

E*Trade selected Everypath as its wireless vendor. On December 8, 1999, E*Trade sent Everypath a letter of intent and memorandum of terms for a development agreement. By early 2000, Everypath had a team and had venture capital funding. Everypath worked with E*Trade to implement a complete wireless solution that met E*Trade's specification. In March 2000, Everypath and E*Trade entered into an "Application Development and Service Provider Agreement." E*Trade paid Everypath $40,000 for its product.

---

[15] Krothapalli worked for Everypath in research and development.

*Arrowpath*

Before October 1999, E*Trade had an investment arm called E*Trade Ventures. Arrowpath, a limited liability corporation, came into existence in October 1999.

Tom Bevilacqua, the managing partner of Arrowpath, testified that E*Trade was one of Arrowpath's investors. Arrowpath Venture Fund was the General Partner in a limited partnership called the Ecommerce Fund. E*Trade was a 25 percent contributor to the Ecommerce Fund, which Arrowpath managed. Arrowpath would receive 20 percent of the Ecommerce Fund's net profits. In turn, E*Trade would receive 50 percent of Arrowpath's profits from the Ecommerce Fund.

Before October 1999, Bevilacqua worked at E*Trade as general counsel. In addition, he took on responsibility for mergers and acquisitions. In October 1999, Bevilacqua left E*Trade as an employee and took the role of managing partner of Arrowpath. However, Bevilacqua retained the title of Chief Strategic Investment Officer at E*Trade. Jerry Gramaglia, an E*Trade employee, worked for Arrowpath as the "entrepreneur in residence." From the fall of 1998 until April 2000, Gramaglia was E*Trade's Chief Marketing Officer. Significantly, Gramaglia's business card showed that Arrowpath Venture Capital was an "E*Trade Group, Inc., Associated Venture Fund."

According to E*Trade's "10K" filing with the Securities and Exchange Commission, E*Trade Group Inc. was listed as a member of Arrowpath. In October 1999, Arrowpath had an advisory committee. One of the members of the advisory committee was E*Trade's CEO.

Arrowpath sought to invest in e-commerce companies and use E*Trade's resources to improve the value of those companies. Arrowpath provided $3.5 million in investment capital to Everypath in early 2000. In addition, Arrowpath mentioned its investment in Everypath to other investors.

*Trial Testimony*

At trial, Ajaxo's expert witness Earl Rennison testified that after examining Ajaxo's technology and Everypath's technology, he concluded that Everypath's technology was "almost identical to the processes of Ajaxo's." Furthermore, after examining the state of Everypath's software as it existed at different times, he concluded that Ajaxo's and Everypath's software was "basically the same, the same technology."

Rennison reviewed and investigated Everypath's patent applications and determined that there was one for "automatic form filling," which included

Baca as an author. He opined, "[t]he information that was expressed in this patent was the same information which was communicated in meetings between Ajaxo and E*Trade to Dan Baca of E*Trade."

Rennison opined that Ajaxo's technology had independent economic value derived from the fact that Ajaxo's technology was not generally known. Rennison told the jury that in September 1999 there was no other technology that could accomplish "what the Ajaxo Wirelessproxy technology [could] accomplish[]." Rennison described in detail to the jury what he opined was the Ajaxo trade secret. Moreover, he opined that Ajaxo "had fully communicated the specifics of its trade secret to E*Trade . . . in sufficient detail to permit implementation."

Rennison pointed out to the jury that "E*Trade had five hours of meetings with Ajaxo to do a technology drill-down and got very specific detail on the technology. And so . . . there was clearly ample time for them to understand very clearly about how the technology worked and how to go out and effectively implement that technology."

During his review of the Everypath source code library, Rennison told the jury that he was able to conclude that as of October 11, 1999, Everypath had not "come up with the solution for breaking the cache." However, four days later it had developed a solution that was identical to the one that Ajaxo used. Based on his experience, Rennison expressed the opinion that four days was an insufficient time for Everypath to develop the solution for breaking the cache, "without external clues to that information." Ultimately, Rennison concluded that it would have been very difficult for Everypath to develop independently the wirelessproxy technology in two months.

Joe Raymond testified that he began work on E*Trade's wireless project in August 1999. Around that time, Sprint had just released some "early models" of its Web-enabled telephones. At that time, he understood that Sprint was intending to release a Web-enabled telephone in January 2000. Raymond analyzed the marketplace to find out "what devices were out . . . in the marketplace at that time and what prospective devices might come into the marketplace in the future." He gave his reports to Debra Chrapaty, E*Trade's Chief Media Officer in the Digital Financial Media Division, and Pamela Kramer, E*Trade's Vice-President of Digital Financial Media.

Pamela Kramer testified that E*Trade concluded that they needed to deliver stock trading capability on a wireless platform. E*Trade realized that it did not have the expertise to develop the technology for the wireless phone trading "in house." Accordingly, in July or August 1999, E*Trade actively looked for a "partner" to provide the technology.

E*Trade first met with Everypath when it was still known as Webonphone. Kramer recalled that there were E*Trade people talking to Everypath before September 1999. Raymond admitted that he introduced Everypath to Arrowpath as a possible investment opportunity, but discovered that Arrowpath was already aware of Everypath. Raymond understood that Arrowpath knew about Everypath from Tom Bevilacqua. Raymond acknowledged that he had mentioned Ajaxo to the venture group, but discovered from Koo that he was not interested in venture capital funding.

Jerry Gramaglia admitted that he had received an e-mail from Everypath in April 1999. Attached to that e-mail was an "executive summary" of the company Everypath. He forwarded the e-mail to Guy Albanese along with the executive summary asking him what he thought about Everypath as a company.

Pamela Kramer admitted that she spoke with Grace Yang, one of the founding members at Arrowpath, to consider "taking a look" at Everypath.

During trial, Ajaxo introduced into evidence print copies of many e-mails sent between various E*Trade personnel, and between E*Trade personnel and Everypath personnel. In addition, Ajaxo introduced other documents that E*Trade personnel had produced. Suffice it to say that during the period that E*Trade was evaluating Ajaxo and learning about Ajaxo's technology, E*Trade was in contact with Everypath. Some of the more significant e-mails included the following.

On September 14, Raymond sent an e-mail to Kramer concerning Ajaxo. Raymond told Kramer that E*Trade "should leverage any expertise [they] could get [their] hands on." In reply, Kramer suggested that they should use a company called Spyglass to evaluate other vendors.

On September 21, Dennis Lundien[16] e-mailed Raymond. He confirmed that they had agreed to participate in developing investment opportunities with outside companies. Raymond was to be the "point person" by arranging meetings.

On September 24, Lundien e-mailed Raymond requesting that Raymond speak to Kramer about having venture participation at the Digital Financial Media staff meetings. Raymond admitted that the new venture participation that Lundien described in the e-mail was the investment arm of E*Trade looking at new early stage companies.

---

[16] Lundien worked in E*Trade's investment arm.

A series of e-mails dated October 12, 1999, confirmed that Raymond intended to meet with Ajaxo on October 15.[17] Albanese, who was doing some of the technical evaluation, sent Raymond an e-mail asking him if he wanted "to discuss the plan of attack" before the meeting with Ajaxo.

Baca e-mailed Raymond and Albanese saying that despite Raymond's not being able to make the meeting they should go anyway and "drill down on the technical questions and issues."

On October 13, 1999, Raymond learned that Ameritrade and Sprint had forged an agreement that would let their customers trade on line over Sprint's wireless network. Raymond e-mailed Kramer that they should get "Sprint PCS back in here to get our arrangements in line with the competition." Raymond admitted that it was about this time that he told Ajaxo that a letter of intent was being prepared. At the same time, he wanted Baca to "drill down" on the Ajaxo technology.

Raymond did not recollect Baca telling him about the technical binder following the October 15 meeting. He recalled a conversation he had with Chun on October 18, however, in which he told Chun that E*Trade was trying to learn more about Ajaxo's product, but felt they did not have all the answers they needed. Raymond recalled that Ajaxo's "general feeling" was that until they had a contract, Ajaxo was reluctant to give more technical information. Raymond denied that he told Ajaxo that E*Trade did not do business with people who were not "team players."

Raymond recalled that as result of this phone conversation, there was "an opening up, a desire to talk further on the part of Ajaxo to bring more information to bear."

Raymond recollected that when Baca returned from the October 15 meeting with Ajaxo, Baca expressed the view that he "did not feel fully comfortable with the Ajaxo solution in a general sense due to lack of thorough information."

Raymond admitted that as of September 24, of the vendors that they had talked to, only Ajaxo could accomplish a wireless trade.

In response to an e-mail Raymond received from Baca on September 24, he translated Baca's comments as " 'Alpha' launch a week from Friday, Beta launch November 1, full product release January 15." Raymond explained that this meant that E*Trade needed to keep up with the competition. The

---

[17] Raymond recollected that he did not attend the meeting.

next sentence of Raymond's e-mail indicated that he thought that E*Trade was "ready for such a cycle between the contacts [E*Trade] ha[d] at Ajaxo and [Everypath]." Again, Raymond admitted that he knew at this time that Ajaxo was the only vendor to demonstrate stock trading capability on a wireless phone. The next sentence of the e-mail said, "Let the games begin."

Raymond identified a "matrix" document he had made in which he assigned certain values to the vendors E*Trade was evaluating. As of November 9, 1999, four days after Kramer told Ajaxo that it was not the right partner for E*Trade, Raymond rated Ajaxo higher than Everypath.

A detailed analysis showed that three vendors were still in the running in late November 1999. Ajaxo was still on the list. Raymond testified, however, Ajaxo was "not giving us what we needed in order to fully evaluate them." In the analysis Raymond wrote, "What else is there to say regarding Ajaxo? Whereas other companies are open-kimono and willing to do the project . . . at cost, Ajaxo holds their cards close and asks for major bucks to deliver. Still Ajaxo is the only company that has an end-to-end solution that with tweaks, porting of servers, and some documents could be employed today." Again, Raymond admitted that as of this time only Ajaxo had demonstrated wireless trading capability.

Raymond recalled that around November 12, he had gone to Everypath to review requirements and to talk about the possibility of purchasing into a relationship with Everypath.

An e-mail from Mike Scolari at Everypath to Raymond dated November 12, 1999, indicated that Everypath appreciated Raymond and Baca's reviewing E*Trade's specifications with Everypath. In addition, Scolari told Raymond that Everypath had been "diligently at work" on a proposal. Scolari asked if he could "come by" and drop off the proposal on Wednesday.

Raymond admitted that he reviewed Everypath's proposal before it was submitted to E*Trade. An e-mail from Raymond to Baca and Albanese showed that Raymond was in the middle of reading the proposal and "it appear[ed] that they [had] answered all questions thoroughly and they [were] hitting the sweet spots with many elements." Raymond's only concern was Everypath's ability to deliver. Baca e-mailed Raymond the next day saying that he thought they could as long as they did not hit any snags, but said he would have a better "feel" after the engineering visit.

On December 7, 1999, Raymond prepared an analysis of the three remaining vendors for Debra Chrapaty. Raymond concluded that Ajaxo was too small and Aether was not acceptable for various reasons. This left Everypath as the only possible partner. An agreement went out to Everypath the next day.

Initially, e-mails between Baca and Raymond showed only two vendors under consideration, Ajaxo and Wolfe Technology. After the September 15 meeting between E*Trade and Ajaxo, Everypath's name showed up in e-mails Albanese sent to Raymond and Baca. On September 16, Raymond, Baca and Albanese met with Everypath. Raymond recalled that Scolari and Prakash Iyer were present for Everypath. Everypath gave a PowerPoint presentation as opposed to a live trading demonstration.

In an e-mail dated September 17, 1999, Baca asked Raymond if he was getting close to talking about a contract with Ajaxo. Raymond could not recall if he discussed the issue with Baca. On September 20, Raymond received an e-mail from Baca suggesting that Everypath be considered as a vendor.[18] Raymond suggested to Baca that he set up a meeting with Ajaxo to discuss the nature and terms of an Ajaxo/E*Trade relationship. Raymond wrote, "Simply indicate that we would like to have them in to discuss the business side of our relationship."

Lisa Chui, Everypath's senior application engineer, testified that when she started work at Everypath in October 1999 she was working on a voice application. That voice application for E*Trade was never commercially deployed. She remembered that she was told to prepare a voice application demonstration for the "Red Herring" conference.[19] The demonstration was to include only stock quotes and the news. There was no trading functionality. Her notes reflected that she was to use "static pages" instead of "live pages," which indicated that this was to be a static demonstration rather than a live demonstration. Chui began work on the E*Trade wireless data application in December 1999 and stopped work on the voice application. When Chui started working on the data application for E*Trade it did not have trading functionality.

Chui was introduced to Baca when she started work on the E*Trade application. A series of e-mails between Baca and Chui indicate that Baca reviewed the E*Trade application Chui was working on, and made recommendations to improve it.

Jennifer Gill Roberts, a partner in the Sevin Rosen Investment Fund,[20] confirmed that at a partners meeting on September 13, 1999, the partners decided to make an investment in Everypath. The investment closed in November 1999.

---

[18] Around this time, Wolfe Technology was dropped from consideration.

[19] The Red Herring conference is a conference where companies demonstrate their newest technology.

[20] In addition to being a partner at Sevin Rosen, Roberts sat on the board of directors at Everypath.

Roberts admitted that she spoke with Guy Albanese in September 1999. She was given his name and phone number by Everypath's CEO. She recollected that Albanese viewed Everypath's product as a voice and data platform.

After the telephone conversation with Albanese, Roberts prepared a memorandum outlining her rationale for recommending an investment in Everypath.

### Procedural History

Ajaxo filed suit against E*Trade and Everypath on October 27, 2000. Ajaxo's operative complaint alleged that E*Trade had breached the NDA and that both E*Trade and Everypath had misappropriated Ajaxo's trade secrets. Ajaxo sought damages, exemplary damages, and equitable relief. Specifically, with respect to damages, Ajaxo prayed for "[c]ompensatory damages for lost profits in the sum of five-hundred thousand dollars ($500,000.00) per month for so long as the misappropriation continues, together with interest as permitted by law. [¶] Unjust enrichment damages pursuant to Civil Code Section 3426.3 according to proof at trial. [¶] Reasonable Royalties pursuant to Civil Code Section 3426.3 according to proof at trial." Regarding the breach of the NDA, Ajaxo sought damages "in an amount to be proven . . . at trial" and "appropriate equitable relief."

The jury trial began on March 5, 2003. The court heard all the parties' in limine motions. Thereafter, a seven-week jury trial included extensive testimony from 17 witnesses called by Ajaxo, two witnesses called by E*Trade, and one witness called by Everypath. At the end of the plaintiff's case, E*Trade and Everypath moved for nonsuit on Ajaxo's misappropriation claim. The trial court granted a partial nonsuit on the issue of damages for the misappropriation, but allowed the issue of liability to go to the jury.

As noted, the jury returned a special verdict in Ajaxo's favor on the breach of the NDA and the misappropriation of Ajaxo's trade secret by E*Trade and Everypath.

Following the jury trial on the issue of liability and damages for E*Trade's breach of the NDA,[21] Ajaxo asked the court to award a reasonable royalty and punitive damages against E*Trade and Everypath in connection with the misappropriation claim. Ajaxo's counsel made an opening statement to the court. Both E*Trade and Everypath moved for nonsuit. The court granted the motion for nonsuit.

---

[21] Since at the close of the plaintiff's case on liability and damages, the court granted nonsuit as to Ajaxo's sole remedy theory, unjust enrichment, for the misappropriation of the trade secret claim, the jury was not charged with determining damages for unjust enrichment in connection with that cause of action.

Subsequently, the court heard testimony on Ajaxo's request for a permanent injunction against E*Trade's and Everypath's continuing use of Ajaxo's trade secret. As to E*Trade, Ajaxo sought the injunction under the provisions of the Uniform Trade Secrets Act (Civ. Code, §§ 3426–3426.11),[22] and under the nondisclosure agreement. In a detailed statement of decision, the court denied Ajaxo's claim for injunctive relief.

Thereafter, Ajaxo moved for a new trial on damages, which E*Trade and Everypath opposed. E*Trade moved for a new trial and for JNOV, which Ajaxo opposed. Similarly, Everypath moved for JNOV regarding the jury's finding that Everypath had willfully and maliciously misappropriated Ajaxo's trade secret. Ajaxo opposed the motion.

The court denied all the motions. Subsequently, the court determined that Ajaxo was the "prevailing party" for purposes of recovering attorney fees on the contract. The court awarded Ajaxo $605,387 in attorney fees.

As noted, all parties have appealed.

## Discussion

### E*Trade's Issues on Appeal

E*Trade contends that the court's evidentiary rulings deprived E*Trade of its right to a fair trial.

#### Background

Among others, E*Trade filed two in limine motions to exclude evidence. One was to exclude evidence of $3.5 million in venture capital funding that Everypath had received beginning in March 2000 (the investment evidence). The second was to exclude evidence of Ajaxo's communication with the FBI.

#### The Investment Evidence

Below, E*Trade asserted that a company called Arrowpath Venture Capital, which it conceded was an E*Trade affiliate, through its venture capital fund called E*Trade E-Commerce Fund, L.P. made the investment in Everypath months after the alleged misappropriation was purported to have occurred.

---

[22] In 1984, the California State Legislature adopted the Uniform Trade Secret Act in large part as the California Uniform Trade Secrets Act. (Trade Secrets Practice in California (Cont.Ed.Bar 2d ed. 2004) § 1.2, p. 2.)

Thus, E*Trade argued, permitting Ajaxo to introduce E*Trade's indirect investment in Everypath as evidence of E*Trade's liability would be prejudicial and misleading.

During the hearing on E*Trade's motion, Ajaxo's counsel argued that the investment evidence was "central to the proof in this case of the misappropriation and the motivation therefor."

The court agreed with E*Trade that the investment evidence would be "irrelevant" and "highly prejudicial" unless Ajaxo could establish a direct link between E*Trade's alleged misappropriation and Arrowpath's investment. The court explained: "One of the things the plaintiff has to do in order to show that however the money may have gone from E*Trade to Arrowpath to Everypath, however that was accomplished, you're going to have to connect the dots, meaning that it's—the suggestion is being made that there was a misappropriation of trade secrets owned by Ajaxo and that the subsequent monies from the venture capital firm of Arrowpath into Everypath which E*Trade has some kind of interest in, without going into really the relationship, one of the things the plaintiff is going to have to do is show that there was a connection between the misappropriation and the investment, because otherwise it's irrelevant. And it's been my understanding that the position of Ajaxo up to this point has been that Mr. Baca was the one who misappropriated the trade secrets of Ajaxo while he was an E*Trade employee and then he became an Everypath employee. But the mere fact that he's an employee of E*Trade at the time he allegedly misappropriates the trade secrets, you've got to show some connection that that event, if in fact it happened, that the investment strategy of E*Trade and/or Arrowpath and Everypath, that that was somehow connected, otherwise these can be two totally separate events."

Ajaxo's counsel represented through a detailed offer of proof that senior E*Trade personnel were involved both in the decision to misappropriate Ajaxo's trade secret and in Arrowpath's investment in Everypath. Ajaxo's counsel represented to the court that he had and would present evidence at trial establishing the following: ". . . E*Trade has a business plan looking for emerging high tech companies to invest in. . . . [B]efore they ever run into Ajaxo they come across a company called [Everypath] and discuss investing in [Everypath] if [Everypath] can deliver the technology it badly needs in the wireless marketplace. . . . [Everypath] is not successful in developing that technology and the time is running out. . . . [A] company does come that has the technology. . . . [T]hat company that has the technology is not willing to be purchased by E*Trade as a portfolio company as [Everypath] was willing to be so purchased. . . . there is a discussion among the higher-ups that if the technology of Ajaxo can be delivered to [Everypath], we can then invest in [Everypath], take care of our technological needs, maintain our marketshare

and have a very profitable portfolio company all in one fell swoop. All we have to do then is to get the technology from Ajaxo, transfer it to Everypath and get Ajaxo out of our hair. . . . an employee, high-ranking employee at E*Trade that's its marketing executive goes over to Arrowpath, the investment arm, and . . . the managing partner of the investment arm happens to be an executive officer of E*Trade. And E*Trade then proceeds to invest in this new company now called Everypath. Inquiry: is it relevant to this case of misappropriation to show that investment?"

Faced with this offer of proof, the court denied E*Trade's motion and allowed the evidence concerning Arrowpath's investment in Everypath to be presented to the jury.

Subsequently, E*Trade filed notice of its intention to move for a new trial. In support of its motion for a new trial, E*Trade contended that Ajaxo's counsel had made a false offer of proof concerning the investment evidence when he represented that Ajaxo would prove a direct link between the investment and E*Trade's alleged misappropriation. In its opposition to E*Trade's motion, Ajaxo argued that even if there was some "theoretical prejudice stemming from the admission of this evidence, it was fully rebutted through E*Trade's 'this investment theory is out the window' closing argument." The court denied E*Trade's motion.[23]

*Ajaxo's Communications with the FBI*

According to Koo, in September 1999, an individual accessed Ajaxo's demonstration program without authorization. At the time Koo discovered that the program had been accessed, he did not know who had accessed the program. Koo stated that he reported this "unauthorized" access to the FBI. Subsequently, in April 2001, six months after Ajaxo filed this lawsuit, Koo received an e-mail from a third party suggesting that someone may have planted a "worm" on Ajaxo's server. Koo forwarded this message to the FBI. According to Koo, the FBI advised him that he should "reformat" the server's hard drive. In so doing, Koo destroyed all the electronic files and data that resided on the server pertaining to the E*Trade application of Ajaxo's technology as it existed in the fall of 1999.

E*Trade filed an in limine motion to exclude this evidence. E*Trade argued that permitting testimony concerning FBI investigations had significant potential for misleading or confusing the jury. E*Trade based its motion

---

[23] Below, E*Trade contended that Ajaxo's counsel was guilty of misconduct in stating that he had the evidence of the direct link between the investment evidence and the misappropriation. On appeal, E*Trade argues that since this misconduct caused prejudice to E*Trade and led to the court admitting the evidence, the court erred in declining to grant a new trial.

to exclude the FBI evidence on the fact that Ajaxo had successfully blocked E*Trade's pretrial discovery efforts concerning these communications. Contending that the communications with the FBI were irrelevant, Ajaxo's former counsel would not allow Koo or Chun to provide complete deposition testimony concerning the issue. Furthermore, Ajaxo had not provided a complete production of documents relating to the communication with the FBI.[24]

After a lengthy hearing, the court denied E*Trade's in limine motion. The court ruled, "the call to the FBI in 1999 . . . will be admitted, [because] it corroborates and supports. Mr. Koo's contention that there had been an unauthorized entry into his computer systems." Regarding the testimony concerning Koo's contact with the FBI in 2001, the court ruled that the testimony could come in because it explained Koo's destruction of the electronic source code.

E*Trade argues that the court erred in admitting "highly prejudicial evidence concerning the Arrowpath investment in Everypath and Ajaxo's communications with the FBI." In so doing, E*Trade was deprived of a fair trial. E*Trade argues that the court abused its discretion in admitting this evidence. Consequently, E*Trade contends that this court should vacate the judgment and remand the case for a new trial.

Evidence Code section 310 provides: "(a) All questions of law. (including but not limited to questions concerning . . . the admissibility of evidence . . .) are to be decided by the court."

" 'Broadly speaking, an appellate court reviews any ruling by a trial court as to the admissibility of evidence for abuse of discretion.' [Citation.]" (*People ex rel. Lockyer v. Sun Pacific Farming Co.* (2000) 77 Cal.App.4th 619, 639 [92 Cal.Rptr.2d 115].)

"In reviewing the trial court's exercise of its discretion under Evidence Code section 352, we do not substitute our judgment for that of the trial court. [Citation.] We may grant relief only when the asserted abuse constitutes a miscarriage of justice, [citation] that is, when in the absence of the improperly admitted evidence a result more favorable to the complaining party would likely have occurred [Citation.]." (*Wanland v. Los Gatos Lodge, Inc.* (1991) 230 Cal.App.3d 1507, 1523 [281 Cal.Rptr. 890].)

As we have said before, " '[w]hile the concept "abuse of discretion" is not easily susceptible [of] precise definition, the appropriate test has been enunciated in terms of whether or not the trial court exceeded " 'the bounds of

---

[24] During discovery, E*Trade moved to compel this information. The court denied the request.

reason, all of the circumstances before it being considered. . . .' " [Citations.]' [Citation.] 'A decision will not be reversed merely because reasonable people might disagree. "An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge." [Citations.] In the absence of a clear showing that its decision was arbitrary or irrational, a trial court should be presumed to have acted to achieve legitimate objectives and, accordingly, its discretionary determinations ought not [to] be set aside on review.' [Citation.]" (*Schall v. Lockheed Missiles & Space Co.* (1995) 37 Cal.App.4th 1485, 1488, fn. 1 [44 Cal.Rptr.2d 191].)

E*Trade argues that the investment evidence was particularly prejudicial because it allowed Ajaxo "to conjure up the appearance of a circumstantial case against E*Trade." E*Trade contends that Ajaxo had no witnesses to or other direct evidence of any misappropriation and could prove only a series of communications between the parties, all of which, E*Trade argues, were consistent with its position that it acted properly and was simply evaluating different wireless vendors. Thus, E*Trade argues, Ajaxo used the investment evidence to supply the essential theory of motive. As a result, E*Trade asserts, "[t]he prejudice was palpable" because it "allowed Ajaxo to present a motive theory to add the false appearance of weight to its entirely circumstantial case."

█ Fundamentally, E*Trade misunderstands the test for when evidence is more prejudicial than probative. Exclusion of evidence under Evidence Code section 352 is reserved for those cases where the proffered evidence has little evidentiary value and creates an emotional bias against the defendant. (*Bihun v. AT&T Information Systems, Inc.* (1993) 13 Cal.App.4th 976, 989 [16 Cal.Rptr.2d 787], overruled on other grounds in *Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 664 [25 Cal.Rptr.2d 109, 863 P.2d 179].)

Thus, regarding the court's admission of the investment evidence, based on counsel's offer of proof, we agree with the trial court that the investment evidence was relevant. Implicitly, the court weighed the probative value of the evidence against the prejudice to E*Trade and concluded that it was more probative than prejudicial. Even though Arrowpath's investment in Everypath came after the misappropriation, the evidence was relevant and probative to show that E*Trade and Arrowpath were deeply entangled. That is, the people who made the decision at Arrowpath to invest in Everypath were the same people who were at E*Trade during the time E*Trade had an investment strategy to invest in early stage companies and was looking to find a partner to provide wireless trading technology.

E*Trade fails to explain how this evidence was more prejudicial than probative—that is, how it created an emotional bias against E*Trade. The

investment evidence was just one of many relevant facts from which the jury could have concluded that E*Trade had a motive to misappropriate Ajaxo's trade secret.

Accordingly, we conclude that the trial court did not abuse its discretion in admitting the investment evidence.

Alternatively, E*Trade seems to be arguing that the trial court abused its discretion in denying E*Trade's new trial motion.[25]

Below, E*Trade argued that the evidence presented at trial established that Ajaxo's offer of proof was false. E*Trade asserted that it was entitled to a new trial because its right to a fair trial was jeopardized by the erroneous admission of the prejudicial evidence. As noted, the trial court denied E*Trade's motion for a new trial.

In effect, a motion for a new trial is a new and independent proceeding, in which the trial court can reweigh the evidence and reevaluate the credibility of the witnesses. The trial court is authorized to disbelieve witnesses and draw inferences from the evidence contrary to the inferences drawn by the jury. (*Eltolad Music, Inc. v. April Music, Inc.* (1983) 139 Cal.App.3d 697, 705 [188 Cal.Rptr. 858].)

The grounds upon which a new trial may be granted are statutory. (*Sanchez-Corea v. Bank of America* (1985) 38 Cal.3d 892, 899 [215 Cal.Rptr. 679, 701 P.2d 826].) Code of Civil Procedure section 657 lists seven such grounds. Included within that list is "[i]rregularity in the proceedings of the court, jury or adverse party, or any order of the court or abuse of discretion by which either party was prevented from having a fair trial."

On review, some courts have applied the same standard of review to orders denying new trial as to orders granting new trial, that is, the abuse of discretion test. (See, e.g., *Jacoby v. Feldman* (1978) 81 Cal.App.3d 432, 446 [146 Cal.Rptr. 334].) On the other hand, the California Supreme Court has stated that appellate courts in reviewing such an "order *denying* a new trial, as distinguished from an order *granting* a new trial, . . . must fulfill our obligation of reviewing the entire record, including the evidence, so as to

---

[25] Although an order denying a new trial is not directly appealable, we may review it after the final judgment as an order substantially affecting the rights of the parties. (Code Civ. Proc., § 906 ["Upon an appeal pursuant to Section 904.1 or 904.2, the reviewing court may review *the verdict or decision and any intermediate ruling, proceeding, order or decision which involves the merits or necessarily affects the judgment or order appealed from or which substantially affects the rights of a party, including, on any appeal from the judgment, any order on motion for a new trial . . . .*"].)

make an independent determination as to whether the error was prejudicial. [Citations.]" (*City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 872 [135 Cal.Rptr. 647, 558 P.2d 545].) Accordingly, we apply this test to the denial of the new trial motion here.

At the outset, we note, however, that we have concluded that the admission of the investment evidence was not "prejudicial" as that term is understood for Evidence Code section 352 purposes. Furthermore, after reviewing the entire record, we conclude that Ajaxo did not fail in its offer of proof. Specifically, Ajaxo proved that some of the people that made the decision to invest in Everypath were the same people that worked at E*Trade while E*Trade was engaged in its quest for a "partner" to provide wireless trading technology. Ajaxo may not have proved by direct evidence that there was "a discussion among the higher-ups," but Ajaxo presented enough other evidence from which the jury could make a reasonable inference that such a discussion had taken place. For instance, the evidence showed that Jerry Gramaglia, E*Trade's Chief Marketing officer, had asked Baca to find a wireless system to allow E*Trade to participate in the Sprint Internet-phone launch. Once Arrowpath formed, Gramaglia worked for Arrowpath as the "entrepreneur in residence." Before October 1999, Tom Bevilacqua worked at E*Trade as general counsel. In addition, he took on responsibility for mergers and acquisitions. Bevilacqua left E*Trade in October 1999 to become managing partner at Arrowpath. However, he retained the title at E*Trade of Chief Strategic Investment Officer. Arrowpath sought to invest in e-commerce companies and use E*Trade's resources to improve the value of those companies.

As early as May 1999, Everypath expressed a desire to become a partner with E*Trade. Around this time, Guy Albanese met with Everypath. A series of e-mails between Albanese and Gramaglia showed that Everypath was a private company that hoped to go public after its technology was ready and adopted by "front runners like E*Trade." Furthermore, Albanese told Everypath that E*Trade did "IPO's" and that there was a possibility that E*Trade could invest in Everypath and its patents.[26] Albanese was the person who told Everypath that it needed to change direction from voice to data.

Far from failing to provide the evidence that E*Trade and Arrowpath were inextricably entwined, as noted *ante*, Ajaxo presented evidence that some of the people who made the decision to invest in Everypath were the same people who worked at E*Trade while E*Trade was actively searching for a vendor to provide wireless trading technology.

---

[26] At this time, Everypath's technology would translate text to speech.

Adding this evidence to the following evidence, the jury could reasonably have concluded that E*Trade's misappropriation of Ajaxo's trade secrets was willful and malicious. E*Trade was actively looking for a partner to provide wireless trading technology. At a time when Ameritrade and Sprint had forged an agreement, only Ajaxo had demonstrated wireless trading. However, Ajaxo was not interested in E*Trade's investment, but E*Trade needed the wireless trading to stay competitive. E*Trade wanted to invest in new early stage companies.

Accordingly, we reject E*Trade's assertion that the trial court erred in denying E*Trade's motion for a new trial.

As regards Ajaxo's communications with the FBI, again we find no abuse of discretion. The trial court engaged in a long and detailed evaluation of the relevance of the evidence, including reviewing Koo's deposition testimony and balanced its probative value against the prejudice to E*Trade. The court noted that the "probative value of all of this is highly relevant to corroborate Mr. Koo's position that he believed the system was entered without authorization . . . [a]nd I don't think it's prejudicial to the defense, at least it's not—the probative value is not substantially outweighed by any prejudice to the defense, because the mere fact that somebody reports something to law enforcement is a logical thing for one to do. And somehow that if we invoke the FBI, that that's going to prejudice the defense? No, I just don't think it does when you balance it, as I must on a 352 objection, and weigh it against Mr. Koo and Ajaxo's right to put their case on."

We reiterate that E*Trade misunderstands the test for when evidence is more prejudicial than probative. We note, again, that exclusion of evidence under Evidence Code section 352 is reserved for those cases where the proffered evidence has little evidentiary value and creates an emotional bias against the defendant. (*Bihun v. AT&T Information Systems, Inc., supra*, 13 Cal.App.4th at p. 989, overruled on other grounds in *Lakin v. Watkins Associated Industries, supra*, 6 Cal.4th 644, 664.)

Here, the FBI evidence was relevant to explain why Koo destroyed the source code. However, notwithstanding E*Trade's comment that the admission of this evidence "helped Ajaxo create the illusion of circumstantial evidence in support of its claims," again E*Trade fails to explain *how* this evidence was more prejudicial than probative, such that it would have created an emotional bias against E*Trade.[27]

Accordingly, we reject E*Trade's contention that the trial court abused its discretion in admitting evidence of Koo's communications with the FBI.

---

[27] The court did not allow Koo to testify to the details of his communications with the FBI. The court allowed him to testify only that he had talked to them.

E*Trade asserts that the trial court erred in denying E*Trade's motion for JNOV.

E*Trade argues that in order to prevail on its claim for misappropriation of trade secrets and breach of the NDA, Ajaxo was required to establish that E*Trade disclosed protected information to Everypath. Unable to do so by direct evidence, Ajaxo attempted to prove E*Trade's disclosure through inferences based on circumstantial evidence. However, E*Trade argues, all these inferences were refuted by "voluminous, unequivocal, and *uncontradicted* evidence that no such disclosure occurred." Thus, E*Trade argues, under these circumstances, Ajaxo's inferences do not constitute " 'substantial evidence' " and are legally insufficient to support the verdict.[28]

"Well-settled standards govern judgments notwithstanding the verdict: 'When presented with a motion for JNOV, the trial court cannot weigh the evidence [citation], or judge the credibility of witnesses. [Citation.] If the evidence is conflicting or if several reasonable inferences may be drawn, the motion for judgment notwithstanding the verdict should be denied. [Citations.] A motion for judgment notwithstanding the verdict of a jury may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict. If there is any substantial evidence, or reasonable inferences to be drawn therefrom in support of the verdict, the motion should be denied. [Citation.] [Citation.] The same standard of review applies to the appellate court in reviewing the trial court's granting [or denying] of the motion. [Citations.] Accordingly, the evidence . . . must be viewed in the light most favorable to the jury's verdict, resolving all conflicts and drawing all inferences in favor of that verdict.' [Citation.]" (*Osborn v. Irwin Memorial Blood Bank* (1992) 5 Cal.App.4th 234, 258–259 [7 Cal.Rptr.2d 101].)

Thus, in reviewing a denial of a motion for JNOV, we review the evidence in the light most favorable to Ajaxo to determine whether substantial evidence supports the jury verdict. (*Flanagan v. Flanagan* (2002) 27 Cal.4th 766, 769 [117 Cal.Rptr.2d 574, 41 P.3d 575].) To put it another way, " '[w]hen a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact.' [Citations.] [¶] 'It is well established that a reviewing court starts with the presumption that the record contains evidence to sustain every finding of

---

[28] It appears that, for the sake of argument, E*Trade assumes that the inferences are reasonable.

fact.' [Citations.]" (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362].)

█ We observe that an appellant has a duty to summarize the facts fairly in light of the judgment. (*Foreman & Clark Corp. v. Fallon, supra,* 3 Cal.3d at p. 881.) "The duty to adhere to appellate procedural rules grows with the complexity of the record." (*Western Aggregates, Inc. v. County of Yuba* (2002) 101 Cal.App.4th 278, 290 [130 Cal.Rptr.2d 436].)

In a case such as this, where there are 23 volumes of trial transcript and 32 volumes of appendix and supplemental appendix, we find E*Trade's recitation of the facts lacking in fairness and completeness. E*Trade's slanted presentation of the facts reads more like argument. Accordingly, we deem that E*Trade has waived this issue on appeal because of its failure to carry its burden of providing this court with a fair and complete summary of the evidence.

We will address the merits of E*Trade's contention, however, to clarify that circumstantial evidence is not trumped by direct evidence, when the direct evidence consists of denials by E*Trade personnel and Everypath personnel that anyone from E*Trade disclosed any protected Ajaxo information to Everypath.

█ A party may rely upon "reasonable inferences" from the evidence to support a verdict. (*Hauter v. Zogarts* (1975) 14 Cal.3d 104, 110 [120 Cal.Rptr. 681, 534 P.2d 377].) An "inference" is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established. (Evid. Code, § 600.)

█ When an inference needs to be drawn from the evidence to prove a fact, we call this circumstantial evidence as opposed to direct evidence. Thus, direct evidence is evidence "that directly proves a fact, without an inference or presumption, and which in itself, if true, conclusively establishes that fact." (Evid. Code, § 410.) Formerly, circumstantial evidence was defined as "indirect evidence" in Code of Civil Procedure section 1832. Circumstantial evidence, when relevant, is as admissible as direct evidence. (Cal. Law Revision Com. com. to repeal of Code Civ. Proc., § 1832, 20 West's Ann. Code Civ. Proc. (1983 ed.) following §§ 1827–1832, p. 19.) In *People v. Goldstein* (1956) 139 Cal.App.2d 146, 152-153 [293 P.2d 495], the Second District Court of Appeal summarized the difference between direct and circumstantial evidence. "Direct evidence is that which is applied to the fact to be proved, immediately and directly, and without the aid of any intervening fact or process: as where, on a trial for murder, a witness positively testifies he saw the accused inflict the mortal wound, or administer the poison. Circumstantial evidence is that which is applied to the principal fact,

indirectly, or through the medium of other facts, from which the principal fact is inferred. The characteristics of circumstantial evidence as distinguished from that which is direct, are, first, the existence and presentation of one or more evidentiary facts; and, second, a process of inference, by which these facts are so connected with the fact sought, as to tend to produce a persuasion of its truth. . . . . It has been said that circumstantial evidence, as distinguished from direct evidence, is testimony not based on actual personal knowledge or observation of the facts in controversy, but of other facts from which deductions are drawn, showing indirectly the facts sought to be proved. [Citation.]"

Hence, "[t]he term 'circumstantial evidence' emphasizes the effect of the evidence-the necessity of drawing inferences from it." (1 Witkin, Cal. Evidence (4th ed. 2000) Circumstantial Evidence, § 1, p. 322.)

Relying on *Hicks v. Reis* (1943) 21 Cal.2d 654 [134 P.2d 788] (*Hicks*) and *Teich v. General Mills* (1959) 170 Cal.App.2d 791 [339 P.2d 627] (*Teich*), E\*Trade asserts that a party may not rely upon an inference to establish a fact where the inference is refuted by clear evidence establishing the nonexistence of that fact.

In *Teich*, the plaintiff developed a kit to allow children to make "sun pictures." (*Teich, supra*, 170 Cal.App.2d at p. 795.) He presented the kit to the defendant, a cereal manufacturer, demonstrated its use, and left some samples with the defendant. (*Id.* at p. 796.) Subsequently, the defendant decided to include a similar product from a different source in its "Trix" cereal line. (*Id.* at. p. 797.) The plaintiff contended that the defendant had copied the idea and that the defendant owed him money for the reasonable value of his product. (*Id.* at pp. 794–797.)

The defendant denied that it had copied the plaintiff's product, contending that a third party advertising agency had independently developed a similar product and submitted it to defendant. At trial, the defendant called as witnesses its employees and those of the advertising agency. They all testified that the advertising agency had independently developed and submitted the product to the defendant. The defendant introduced documentary evidence, including correspondence with the advertising agency, to demonstrate that the advertising agency had submitted its own product to the defendant. (*Teich, supra*, 170 Cal.App.2d at pp. 799–801.)

After the jury returned a verdict for the plaintiff, the trial court granted defendant's motion for JNOV. The Court of Appeal affirmed. The court observed that the plaintiff's testimony concerning the presentation of his product to the defendant, as well as the similarities between the two products, had

raised an "inference" that the defendant had copied the plaintiff's product. The court explained, however, that this inference had been dispelled by direct evidence to the contrary and was therefore insufficient to support the verdict. (*Teich, supra,* 170 Cal.App.2d at p. 799.)

E*Trade contends that the inferences relied upon by Ajaxo in this case were dispelled by clear, positive and uncontradicted evidence that E*Trade did not disclose any protected information to Everypath. As such, E*Trade asserts, the judgment fails the substantial evidence test.

We find E*Trade's reliance on *Teich* misplaced. The "inference" that the *Teich* court talked about was, in fact, a "presumption."[29] As Witkin explains it, "[f]ormer statutes defined a presumption as a deduction that the law expressly directs to be made from particular facts, and an inference as a deduction that the jury *may* make from the facts. Because 'the law' then meant 'statutes,' an unfortunate distinction arose between statutory presumptions and nonstatutory presumptions; the latter had to be classified as 'inferences.' " (1 Witkin, Cal. Evidence, *supra,* Burden of Proof and Presumptions, § 48, p. 197.)

"Former statutes classified presumptions as a form of 'indirect evidence,' and stated that, unless a presumption was controverted, the jury had to find according to the presumption. Under these statutes, the rule became established that presumptions constituted independent evidence, to be somehow weighed against other evidence, and that a verdict or finding could rest upon a presumption even though all of the other evidence was opposed to it." (1 Witkin, Cal. Evidence, *supra,* Burden of Proof and Presumptions, § 49, p. 197, italics added.)

A number of cases addressing the nonstatutory presumptions or inferences required the trier of fact to come to a certain conclusion unless the defendant presented some quantum of contrary evidence. These cases came to apply the rule that the inference was dispelled as a matter of law, where the contrary evidence was "clear, positive, uncontradicted, and of such a nature that it can not rationally be disbelieved." (*Blank v. Coffin* (1942) 20 Cal.2d 457, 461 [126 P.2d 868]; *Leonard v. Watsonville Community Hospital* (1956) 47 Cal.2d 509, 515, 518 [305 P.2d 36]; see, *Teich, supra,* 170 Cal.App.2d at p. 799.) Witkin emphasizes that these cases apply to the prior law where juries were required to give credit to nonstatutory "presumptions" or "inferences" unless dispelled. (1 Witkin, Cal. Evidence, *supra,* Burden of Proof and Presumptions, § 52, pp. 201–202.)

---

[29] In the *Teich* case the inference/presumption was that a showing of access and similarity raised an inference of copying. (*Teich, supra,* 170 Cal.App.2d at p. 797.)

Both *Hicks* and *Teich* apply to the type of inference/presumption that must be overcome, rather than the process a jury uses to connect facts to conclusions. Neither *Hicks* nor *Teich* stands for the proposition that circumstantial evidence fails when there is contradictory direct evidence. We agree with Ajaxo when it points out that E*Trade's position fails the common sense test. If the law were as E*Trade suggests, then a purely circumstantial evidence case against a criminal defendant would fail if the criminal defendant were to testify, "I didn't do it."

As noted *ante*, our review of the record discloses that there was substantial evidence to support the jury verdict that E*Trade willfully and maliciously misappropriated Ajaxo's trade secrets. During 1999, only Ajaxo could demonstrate stock trading on a wireless phone. E*Trade learned from Ajaxo how it dealt with the difficult problem of the "cache" and within weeks, too short a time for independent development, Everypath implemented the same solution. When Ajaxo demonstrated its wireless trading capability to E*Trade, E*Trade asked for and was refused the code to access Ajaxo's server. Subsequently, although Ajaxo refused to give its access code for its server, E*Trade personnel used that access code to access Ajaxo's server on at least 16 occasions in the fall of 1999. Within four months after Dan Baca accessed Ajaxo's server without authorization, he went to work for Everypath. While at Everypath, Baca was involved in testing of Everypath's trading solution, which an expert testified was "identical" to that of Ajaxo.

As paragraph five of the NDA acknowledges, keeping an economic advantage was very important to E*Trade.[30] The fact that Arrowpath, a company staffed by some of the same people that were involved in E*Trade's search for a wireless partner, made an investment in Everypath, was strong circumstantial evidence from which the jury could have inferred that E*Trade had an economic motive to misappropriate Ajaxo's trade secret. Arrowpath sought to invest in e-commerce companies and use E*Trade's resources to improve the value of those companies. Arrowpath's "entrepreneur in residence" was an officer at E*Trade during the time that E*Trade was searching for a wireless partner. This same person, Gramaglia, asked Baca to find a wireless system to allow E*Trade to participate in the Sprint Internet phone launch. Guy Albanese, the person who introduced Everypath to Baca, reported to Gramaglia.

---

[30] "The Receiving Party acknowledges and agrees that due to the unique nature of the Disclosing Party's Proprietary Information, there can be no adequate remedy at law for any breach of its obligations hereunder, that any such breach or any unauthorized use of release of any Proprietary Information *will allow Receiving Party or third parties to unfairly compete with the Disclosing Party* resulting in irreparable harm to the Disclosing Party . . . ." (Italics added.)

Furthermore, the day after Baca met with Koo and Chun for Ajaxo's second demonstration of its technology, where technical discussions took place about such things as "buffering the cookie" and "how to sustain the session," Baca met with Everypath personnel. At this time in Everypath's development of "their" product, Everypath had only just shifted in orientation toward data access and in the September/October timeframe, Everypath "did not have a product . . . didn't have the business . . . didn't have a team." Yet on the same day as Baca met with Everypath, an Everypath employee by the name of Prasad Krothapalli sent an e-mail message to Piyush Goel, one of Everypath's founders, in which he outlined assignments for his group members. One of the assignments for an employee by the name of Roopak was "support for session specific cookies with HTTPclient, (one week)." Long-term assignments for Roopak included "support for user name and password," "persistent cookies," "bug fixing" and "infrastructure for data cleansing support"; all things that Baca had learned from Koo.

At a time when E*Trade was actively looking for a partner to provide wireless trading technology, Ameritrade and Sprint had forged an agreement. At this time, only Ajaxo had demonstrated wireless trading, but Ajaxo was not interested in E*Trade's investment. However, E*Trade needed the wireless trading to stay competitive, and E*Trade wanted to invest in new early stage companies.

Finally, even though Everypath had not demonstrated wireless trading capability as of December 1999, E*Trade selected Everypath as its wireless trading vendor partner.

In short, E*Trade needed Ajaxo's technology to stay competitive in the Internet-trading market. Everypath, a company willing to have an E*Trade investment, did not have a similar technology, but it developed the same technology in too short a time for independent development. E*Trade chose Everypath as its wireless trading partner at a time when it had not even demonstrated "its" product could accomplish a wireless trade, and E*Trade through Arrowpath made a substantial investment in Everypath.

Accordingly, we conclude that there was substantial evidence to support the jury verdict that E*Trade willfully and maliciously misappropriated Ajaxo's trade secrets. Consequently, as to liability, the trial court did not err in denying E*Trade's motion for JNOV.

With respect to the contract (NDA), in a second line of attack on the trial court's denial of E*Trade's motion for JNOV, E*Trade contends that Ajaxo did not present substantial evidence of legally recoverable contractual damages. E*Trade argues that because damages are a separate, essential element

of a cause of action for breach of contract, where the plaintiff fails to introduce evidence of damages, the cause of action fails.

*Background*

Ajaxo introduced testimony through Koo that Ajaxo licensed its complete technology platform to Infocast, an overseas company, for $700,000. Infocast had the right to sublicense to other companies with a payment of $350,000 per customer. Ajaxo argued in closing that the $700,000 figure should serve as the basis for a damages award of $1.4 million. This sum represented the loss of two licenses, one to E*Trade and one to Everypath.

Further, Koo testified that his development costs were approximately $900,000. Moreover, he had offered to license the Ajaxo technology to E*Trade for $860,000.

E*Trade's counterproposal offered Ajaxo $100,000 upon signing a letter of intent, plus $100,000 at the end of the development phase; plus $200,000 per device, in addition to an end-user earn-out figure.[31]

Ultimately, as noted, the jury awarded Ajaxo $1.29 million in damages for breach of the NDA.

Again, we review the evidence in the light most favorable to Ajaxo to determine whether substantial evidence supports the jury verdict of $1.29 million in damages. (*Flanagan v. Flanagan, supra,* 27 Cal.4th at p. 769.)

First, however, we note that Ajaxo's theory of recovery on the contract was that E*Trade was unjustly enriched because of its breach of the NDA.[32]

We begin with two familiar maxims of jurisprudence: "He who takes the benefit must bear the burden," and "[f]or every wrong there is a remedy." (Civ. Code, §§ 3521, 3523.)

██ "One who commits a breach of contract must make compensation therefor to the injured party. In determining the amount of compensation as the 'damages' to be awarded, the aim in view is to put the injured party in as

---

[31] Joe Raymond explained the end-user earn-out figure as follows: E*Trade proposed to reward Ajaxo "for increment business that they might bring to E*Trade. So that if the market grew . . . [and] this service was accessed by 26,000 customers, [E*Trade] would pay $2.50 per customer [to Ajaxo] for that traffic that they would generate for us."

[32] Although in its pleadings Ajaxo sought compensatory damages, in opening statement Ajaxo's counsel told the jury that the measure of damages for both the breach of the NDA and the misappropriation would be unjust enrichment.

good a position as he would have had if performance had been rendered as promised." (11 Corbin on Contracts (Interim Edition) § 992, p. 5.)

Thus, a jury "must determine what additions to the injured party's wealth (expected gains) have been prevented by the breach and what subtractions from his wealth (losses) have been caused by it." (11 Corbin on Contracts, *supra*, § 992, p. 5.)

■ In this case, we must draw the distinction between damages and restitution. When the remedy given for breach of contract is money damages, the amount awarded is determined with the purpose of putting the injured party in as good a position as he would have occupied had the contract been performed. In granting restitution as a remedy for the breach, however, the purpose to be attained may be no more than the restoration of the injured party to as good a position as that occupied by him before the contract was made. (11 Corbin on Contracts, *supra*, § 996, p. 13.)

Sometimes, unjust enrichment is used as a synonym for restitution. "Its primary use, however, should be to state an ultimate fact: 'because X [here E*Trade] was unjustly enriched [when it failed to uphold the contract], X [E*Trade] must make restitution.' " (1 Corbin on Contracts (rev. ed.) § 1.20, p. 63.)

"The remedy of restitution differs from the remedy in damages in that in awarding damages the purpose is to put the injured party in as good a position as he would have occupied, had the contract been fully performed, while in enforcing restitution, the purpose is to require the wrongdoer to restore what he has received and thus tend to put the injured party in as good a position as that occupied by him before the contract was made. Ordinarily, restitution requires that the defendant shall give something back to the plaintiff; and it may be supposed that the defendant cannot do this unless he has received something of value at the plaintiff's hands." (12 Corbin on Contracts (interim ed.) § 1107, p. 24.)

With these principles in mind we conclude that restitution requires the return to Ajaxo of "value" or "benefit" that E*Trade received.

Here, assuming that E*Trade had performed on the NDA, i.e., had kept Ajaxo's trade secrets and proprietary information confidential, Ajaxo would have been in exactly the same position before it entered into the NDA as it would have been after negotiations broke down, except it would have kept its trade secrets and proprietary information away from Everypath. Ajaxo conferred a benefit on E*Trade by giving E*Trade Ajaxo's trade secrets and proprietary information because, ultimately, E*Trade received technology

from Everypath that helped to keep it competitive. Thus, E*Trade was benefited by breaching the NDA. Accordingly, Ajaxo must be "compensated" for E*Trade's breach of the NDA, i.e., by E*Trade disgorging its unjust enrichment.[33]

Here the evidence presented was that Ajaxo's development costs for the Wirelessproxy XO were $900,000. There was some discrepancy between Ajaxo's value of the technology ($860,000) and E*Trade's counteroffer ($400,000 for one device, not including the user earn out provision.) Further, E*Trade paid Everypath $40,000 for the technology Everypath developed. Although we cannot know for certain how the jury arrived at $1.29 million in unjust enrichment to E*Trade, it seems that the jury took Koo's development costs, took the price E*Trade was prepared to pay for Koo's technology, added them together and threw in a little extra for the end-user earn-out provision.

■ By breaching the NDA, E*Trade gave to Everypath information that, in due course, saved E*Trade a lot of money. E*Trade needed the technology that Ajaxo had developed to stay competitive in the Internet-based stock trading market. By giving Everypath information about Ajaxo's technology, E*Trade saved development costs and the cost it proposed to give Ajaxo for its technology.

Accordingly, we find that there was substantial evidence in the record to support an award of $1.29 million in restitution.

Finally, E*Trade contends that the trial court abused its discretion in finding that Ajaxo was the "prevailing party" under Civil Code section 1717.

*Background*

Following the trial court's denial of the parties' various posttrial motions, Ajaxo sought to recover more than $2 million in attorney fees under the prevailing party clause in the NDA. Eventually, the trial court awarded Ajaxo $605,387 in attorney fees.

In the NDA, attorney fees are covered in paragraph five, which states in relevant part: "The Receiving Party acknowledges and agrees that due to the unique nature of the Disclosing Party's Proprietary Information, there can be no adequate remedy at law for any breach of its obligations hereunder, that any such breach or any unauthorized use or release of any Proprietary

---

[33] Paragraph five of the NDA specifically allows for an equitable remedy in addition to "whatever remedies it might have at law."

Information will allow Receiving Party or third parties to unfairly compete with the Disclosing Party resulting in irreparable harm to the Disclosing Party and therefore, that upon any such breach or any threat thereof, the Disclosing Party shall be entitled to appropriate equitable relief in addition to whatever remedies it might have at law *and to be indemnified by the Receiving Party from any loss or harm, including, without limitation, attorney fees, in connection with any breach or enforcement of the Receiving Party's obligations hereunder or the unauthorized use or release of any such Proprietary Information.*" (Italics added.)

Civil Code section 1717 provides: "In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs."

■ "[T]he trial court is to compare the relief awarded on the contract claim or claims with the parties' demands on those same claims and their litigation objectives as disclosed by the pleadings, trial briefs, opening statements, and similar sources." (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 876 [39 Cal.Rptr.2d 824, 891 P.2d 804]; *Scott Co. of California v. Blount, Inc.* (1999) 20 Cal.4th 1103, 1109 [86 Cal.Rptr.2d 614, 979 P.2d 974].) The trial court makes that determination "only upon final resolution of the contract claims and only by 'a comparison of the extent to which each party ha[s] succeeded and failed to succeed in its contentions.' " (*Hsu v. Abbara, supra,* 9 Cal.4th at p. 876.)

A trial court is given wide discretion in determining which party has prevailed on a contract. We will not disturb such a determination on appeal absent a clear abuse of discretion. (Civ. Code, § 1717; *Nasser v. Superior Court* (1984) 156 Cal.App.3d 52, 59 [202 Cal.Rptr. 552].)

E*Trade argues that Ajaxo did not achieve sufficient success to qualify as the prevailing party under the NDA because, in addition to E*Trade's defeating four of Ajaxo's theories of liability under the NDA, Ajaxo sought

and was denied a permanent injunction under its terms.[34] Furthermore, Ajaxo recovered only a fraction of the damages it sought on its contract claim.[35]

We disagree that Ajaxo did not achieve sufficient success to qualify as the prevailing party on the breach of contract (NDA) action. Simply put, the jury found that E*Trade had breached the NDA, and it awarded Ajaxo $1.29 million in damages. While this may have been far short of the damages Ajaxo initially sought, Ajaxo won a simple, unqualified verdict on the breach of contract claim and established monetary damages in excess of $1 million. Ergo, it was the "party prevailing on the contract"—that is, the party who recovered greater relief in the action on the contract. (*Hsu v. Abbara, supra*, 9 Cal.4th at p. 874.)

Accordingly, we conclude that the trial court did not abuse its discretion in determining that Ajaxo was the prevailing party for purposes of awarding attorney fees.

### *Ajaxo's Issues on Appeal*

Ajaxo contends that the trial court erred in granting nonsuit on damages for E*Trade's and Everypath's misappropriation of its trade secrets. We proceed with due regard for Ajaxo's right to have the jury decide contested fact issues.

*Background*

Originally, Ajaxo sought to recover damages for actual loss in connection with its misappropriation of the trade secret cause of action. Specifically, Ajaxo sought "lost profits at the rate of $500,000 per month for so long as the misappropriation continues."

Before trial, Ajaxo designated a damages expert, Nicholas Dewar, who opined that Ajaxo had sustained lost profits totaling $39,257,093.

---

[34] In its opening statement, Ajaxo set forth five separate theories of liability. Ajaxo contended that E*Trade breached the NDA by disclosing protected information to E*Trade's in-house consultants, disclosing protected information to Arrowpath, accessing the Ajaxo demonstration without permission, disclosing protected Ajaxo information to other vendors including Everypath, and changing its functional specifications based on Ajaxo's performance. The trial court granted nonsuit, however, only on the theory that E*Trade disclosed confidential and proprietary information to consultants working at E*Trade. In fact, nonsuit was granted as to every theory of *misappropriation* that did not involve Everypath.

[35] Ajaxo's pleadings show that Ajaxo expected to recover damages for breach of the NDA in an "amount to be proven according to proof at trial." Ajaxo's operative pleading sought damages for lost profits for *misappropriation* at the rate of $500,000 per month. In other words, Ajaxo sought lost profits for damages of $6 million per year from the date of the disclosure of Ajaxo's trade secret, which by the time of trial, amounted to approximately $19.2 million.

When trial commenced, however, Ajaxo stated that its damages theory of recovery for the misappropriation was unjust enrichment. Ajaxo's counsel represented to the court that he would like to tell the jury "that the measure of those damages will be unjust enrichment . . . that the unjust enrichment was the result of all the benefits that Everypath and E*Trade received as a result of the misappropriation."

During opening statement, Ajaxo's counsel explained to the jury that the damages calculation would not be "terribly sophisticated. The damage calculation has to do with what the law calls unjust enrichment. . . . [¶] We claim that there has been unjust enrichment to both E*Trade and Everypath by reason of this misappropriation *and breach of the nondisclosure agreement.*"

At the close of Ajaxo's case, E*Trade moved for nonsuit on the ground that Ajaxo had failed to prove unjust enrichment. The trial court granted E*Trade's motion for nonsuit as to Ajaxo's claim for unjust enrichment on the misappropriation claim.[36]

"A motion for nonsuit is a procedural device which allows a defendant to challenge the sufficiency of plaintiff's evidence to submit the case to the jury. [Citation.] Because a grant of the motion serves to take a case from the jury's consideration, courts traditionally have taken a very restrictive view of the circumstances under which nonsuit is proper. The rule is that a trial court may not grant a defendant's motion for nonsuit if plaintiff's evidence would support a jury verdict in plaintiff's favor." (*Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112, 117–118 [184 Cal.Rptr. 891, 649 P.2d 224].)

"In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded." (*Campbell v. General Motors Corp., supra,* 32 Cal.3d at p. 118.) "A nonsuit in a jury case or a directed verdict may be granted only when disregarding conflicting evidence, giving to the plaintiffs' evidence all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in plaintiffs' favor, it can be said that there is no evidence to support a jury verdict in their favor." (*Elmore v. American Motors Corp.* (1969) 70 Cal.2d 578, 583 [75 Cal.Rptr. 652, 451 P.2d 84].)

---

[36] As noted, the trial court granted a partial nonsuit allowing the issue of E*Trade's liability for misappropriation to go to the jury, but took the issue of damages for that misappropriation from the jury. Partial nonsuits are authorized by Code of Civil Procedure section 581c, subdivision (b), which provides: "If it appears that the evidence presented . . . supports the granting of the motion as to some but not all of the issues involved in the action, the court shall grant the motion as to those issues and the action shall proceed as to the issues remaining."

In reviewing the grant of nonsuit, we are "guided by the same rule requiring evaluation of the evidence in the light most favorable to the plaintiff." (*Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 839 [206 Cal.Rptr. 136, 686 P.2d 656].) Thus, as a reviewing court we are required to resolve " ' "all presumptions, inferences and doubts" ' " favorably to the plaintiff. (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291 [253 Cal.Rptr. 97, 763 P.2d 948].)

■ California's Uniform Trade Secrets Act (Civ. Code, § 3426 et seq.) (hereinafter UTSA) provides that upon proof of misappropriation, a plaintiff in a trade secret action "may recover for the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss." (Civ. Code, § 3426.3, subd. (a).)

Ajaxo asserts that the calculation of damages in a trade secret case is far from an exact science. Then, Ajaxo cites a plethora of cases that it asserts show damages for misappropriation based upon a wide variety of measures, and that do not have to be shown with precision. Finally, Ajaxo concedes that in a case like this, where this court is faced with the task of deciding whether there is any substantial evidence in "the massive record . . . on which the jury could have based an award of damages for 'actual loss' and 'unjust enrichment,' "[37] none of the plethora of cases it has cited assists this court in deciding the propriety of nonsuit on damages.

■ Remedies under the UTSA for the misappropriation of trade secrets include injunctive relief, damages, royalties, punitive damages, and attorney fees. (Civ. Code, §§ 3426.2–3426.4.) Section 3426.3 provides several measures of damages upon proof of misappropriation of trade secrets. Under subdivision (a), a complainant may recover damages for the actual loss caused by misappropriation, as well as for any unjust enrichment not taken into account in computing actual loss damages. Subdivision (b) provides for an alternative remedy of the payment of royalties from future profits where "neither damages nor unjust enrichment caused by misappropriation [is] provable." (See generally *Robert L. Cloud & Associates, Inc. v. Mikesell* (1999) 69 Cal.App.4th 1141, 1149 [82 Cal.Rptr.2d 143]; *Unilogic, Inc. v. Burroughs Corp.* (1992) 10 Cal.App.4th 612, 626 [12 Cal.Rptr.2d 741].)

Initially, we note four things. First, Ajaxo's allegation that E*Trade breached the NDA was the basis for the misappropriation claim. In closing argument Ajaxo's counsel described for the jury the evidence that showed that E*Trade had breached the NDA. Turning to the question of misappropriation of Ajaxo's trade secret, counsel told the jury that "all those points

---

[37] We question why Ajaxo cited to these cases only to concede that they are not helpful to this court.

that [h]e discussed earlier . . . eloquently make the point . . . that there was communication of the trade secrets from E*Trade to Everypath, all that communication . . . described earlier . . . in which this information found its way into the hands of Everypath."[38]

Second, as to the breach of the NDA (contract), the court instructed the jury that the measure of damages "is the amount which will compensate the injured party for all the detriment and loss caused by the breach or which in the ordinary course of things would be likely to result therefrom. The injured party should receive those damages naturally arising from the breach or those damages which might have been reasonably contemplated or foreseen by both parties at the time . . . of the breach. As nearly as possible, the injured party should receive the equivalent of the benefit of the performance. Damages must be reasonable."

Third, as noted, as to "damages"[39] Ajaxo proceeded under theory that E*Trade was unjustly enriched because of the breach of the NDA *and* misappropriation of Ajaxo's trade secrets. The selection of which measure of damages to apply is left to the sound discretion of the trier of fact. (*Carlson Industries v. E.L. Murphy Trucking Co.* (1985) 168 Cal.App.3d 691, 699 [214 Cal.Rptr. 331].) Here, however, the only measure of "damages" that was presented to the jury was unjust enrichment.

Fourth, after judgment was rendered, E*Trade moved for JNOV. E*Trade argued, in connection with the misappropriation of trade secrets, that there was no substantial evidence presented at trial that E*Trade had disclosed any Ajaxo trade secret to Everypath or willfully and maliciously misappropriated Ajaxo's trade secret or proprietary information. In connection with the breach of the NDA, E*Trade argued that there was no substantial evidence presented at trial to support an award of damages to Ajaxo. The trial court denied E*Trade's motion for JNOV.

This state of affairs puzzles us. We fail to see how the trial court could grant E*Trade's nonsuit motion on damages for misappropriation and then

---

[38] In some cases, a breach of contract cause of action may be available where disclosed information does not qualify as a "trade secret" under the UTSA (Civ. Code, § 3426 et seq.) if the information is protected under a confidentiality or nondisclosure agreement, provided the agreement is not an invalid restraint of trade (see Bus. & Prof. Code, § 16600 ["every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void"]). Here, however, as noted, the evidence that showed that E*Trade had breached the NDA was the same evidence that showed that it had misappropriated Ajaxo's trade secret.

[39] Mindful of our discussion of "damages" for breach of the NDA, here we use the term "damages" loosely.

deny E*Trade's motion for JNOV on damages for breach of the NDA when the two were so inextricably linked.[40]

The evidence presented by Ajaxo on the breach of the NDA directly addressed the degree to which E*Trade was unjustly enriched by its action of disclosing Ajaxo's trade secrets and proprietary information.[41] The same evidence would have been sufficient to directly establish the degree to which E*Trade was unjustly enriched because of its misappropriation of Ajaxo's trade secrets.

Accordingly, we must conclude that the court erred in denying Ajaxo the right to have the jury determine the damages for the misappropriation of its trade secret by E*Trade.

We may not reverse a judgment if the plaintiff's evidence "raises nothing more than speculation, suspicion, or conjecture." (*Carson v. Facilities Development Co., supra,* 36 Cal.3d at p. 839.) On the other hand, "reversal is warranted if there is 'some substance to plaintiff's evidence upon which reasonable minds could differ . . . .' [Citations.]" (*Ibid.*)

We have concluded that there was substantial evidence from which the jury could have concluded that E*Trade was unjustly enriched to the tune of $1.29 million for breach of the NDA.[42] Since the evidence of damages for the misappropriation of Ajaxo's trade secrets was the same damages evidence for the breach of contract action, it seems illogical to conclude that Ajaxo presented insufficient evidence of "damages" for misappropriation.

---

[40] As Ajaxo's attorney explained: "It was our trial strategy that we prove two propositions: One, that proprietary information of Ajaxo, including its trade secrets, was disclosed by E*Trade to a third party. Second proposition is that the proprietary information of Ajaxo was received and accepted by Everypath. Proof of those two propositions served not only to establish the breach of the NDA by E*Trade but also served as the core evidence for our misappropriation claim against both parties. So obviously these two independent theories of liability, breach of the NDA and misappropriation of trade secrets, were integrated into a consistent fabric that had to be established or we would lose on all counts. It turns out that your Honor saw the case exactly the same way we did. When it came time on April 15 to decide motions of nonsuit with respect to the NDA, your Honor ruled precisely the same way. To wit, that the only way Ajaxo could prevail on its NDA breach would be to establish disclosure of proprietary information from E*Trade to Everypath. And in the course of proving that, we established to the jury's satisfaction that not only was there a breach of the NDA, but misappropriation of trade secrets willfully and maliciously."

[41] We doubt that the jury was able to distinguish between what was proprietary information and what was a trade secret.

[42] Implicitly, this is exactly what the trial judge concluded in denying E*Trade's motion for JNOV.

Accordingly, we conclude that we must reverse and remand to the trial court for a new trial on damages for E*Trade's misappropriation of Ajaxo's trade secret.[43]

As to Everypath, however, the situation is slightly different because there was no jury award of damages in a contract action. Nevertheless, Ajaxo presented evidence that Everypath sold "its" technology to approximately 30 customers. Moreover, Everypath attracted millions of dollars in venture capital funding and was paid $40,000 by E*Trade for "its" technology.

The jury could have come up with a figure representing unjust enrichment to Everypath using any combination of this information. Mindful that "fundamental to the preservation of our free market economic system is the concomitant right to have the ingenuity and industry one invests in the success of the business or occupation protected from the gratuitous use of that 'sweat-of-the-brow' by others" (*Morlife, Inc. v. Perry* (1997) 56 Cal.App.4th 1514, 1520 [66 Cal.Rptr.2d 731]), we conclude that Ajaxo presented enough evidence of unjust enrichment from which a jury could have made an award to overcome a motion for nonsuit. Accordingly, because the court denied Ajaxo the right to have the jury determine the damages for the misappropriation of its trade secret by Everypath, we must reverse the nonsuit and remand for a retrial on damages for Everypath's misappropriation of Ajaxo's trade secret.

Since we have concluded that this case needs to be sent back to the trial court for further proceedings, we need not address Ajaxo's other issues except the issue of attorney fees.[44]

Ajaxo contends that its entitlement to reasonable attorney fees as prevailing party on the NDA extends to attorney fees incurred prior to trial.

*Background*

In ruling on Ajaxo's attorney fees motion, the court found that the evidence was insufficient to award Ajaxo's prior counsel attorney fees. The court noted that the declarations of current counsel made it "clear that those attorneys did

---

[43] The court's grant of a nonsuit on the issue of damages for misappropriation deprived Ajaxo of an award of exemplary damages. Civil Code section 3426.3 provides for an award of exemplary damages up to twice the award made for unjust enrichment, where a jury finds, as here, willful and malicious misappropriation.

[44] Assuming that a jury awards Ajaxo "damages" for the misappropriation, the need for a permanent injunction will be removed. In the area of trade secrets, the principles applicable to injunctions in general govern. (*Hilb, Rogal & Hamilton Ins. Services v. Robb* (1995) 33 Cal.App.4th 1812, 1820, fn. 4 [39 Cal.Rptr.2d 887].) A court may grant an injunction only when monetary compensation is inadequate. (Civ. Code, § 3422.)

not do a very good job of preparing this case for trial." Further, the court noted that it had not seen any declarations from former counsel indicating what they had done on the case, "no billing records, nothing to support why [the court] should award in excess of $177,000 to these attorneys, one of which is being sued apparently for malpractice because of the fact that he probably did not set up the case correctly."

Ajaxo had the burden of introducing evidence to prove that the fees it sought for its prior counsel's work were reasonable. (*Martino v. Denevi* (1986) 182 Cal.App.3d 553, 558–560 [227 Cal.Rptr. 354].)

Here the only evidence presented of the amount of prior counsel's fees was a declaration from Koo that identified how many hours each attorney allegedly worked, each attorney's billing rate and the resulting fees. Thus, Ajaxo failed to submit any evidence detailing the services each of these attorneys provided, or their qualifications and experience to support the requested billing rates. Accordingly, Ajaxo made no showing to establish the reasonableness of its prior counsel's fees.

As a result, we conclude that the trial court did not abuse its discretion in declining to award attorney fees for Ajaxo's prior counsel.

### *Everypath's Issues on Appeal*

Everypath contends that if this court were to agree with any of Ajaxo's arguments on appeal, we must then consider the issues in Everypath's protective appeal. Since we have agreed with Ajaxo that the trial court erred in granting nonsuit as to the damages for the misappropriation, we proceed to address Everypath's issues on appeal.

Everypath contends that Ajaxo offered no substantial evidence that Everypath willfully and maliciously misappropriated any trade secrets or that Everypath authorized or ratified any willful or malicious conduct.[45] We disagree.

*Background*

As noted, the jury found that Ajaxo proved that Everypath acquired and used Ajaxo's trade secret without Ajaxo's express or implied consent. Furthermore, the jury found that Ajaxo proved that Everypath knew or had reason to know that Everypath's knowledge of the trade secret derived from

---

[45] It appears that Everypath does not challenge the jury's finding that it misappropriated Ajaxo's trade secret.

or through a person who owed a duty to Ajaxo to maintain its secrecy. Moreover, the jury found that Ajaxo proved by clear and convincing evidence that Everypath acted willfully and maliciously in misappropriating Ajaxo's trade secret.

 A trade secret is misappropriated if a person (1) acquires a trade secret knowing or having reason to know that the trade secret has been acquired by "improper means," (2) discloses or uses a trade secret the person has acquired by "improper means" or in violation of a nondisclosure obligation, (3) discloses or uses a trade secret the person knew or should have known was derived from another who had acquired it by improper means or who had a nondisclosure obligation or (4) discloses or uses a trade secret after learning that it is a trade secret but before a material change of position. (Civ. Code, § 3426.1, subd. (b).)

Under the UTSA, two different wrongdoers may be liable for misappropriation of a trade secret: one, a person who actually discloses a trade secret; and two, a person who acquires a trade secret from the discloser. An "acquirer" is not liable under the UTSA unless he knew *or had reason to know* that the trade secret was improperly disclosed. (Civ. Code, § 3426.1, subd. (b).) Furthermore, punitive damages are permitted if "willful and malicious misappropriation exists." (Civ. Code, § 3426.3, subd. (c).)

In this case, the jury's special verdicts encompassed express findings that Everypath acquired Ajaxo's trade secrets; Everypath knew of the wrong committed by E*Trade in that acquisition; Everypath acted willfully and maliciously in appropriating the trade secret; and Everypath authorized or ratified this willful and malicious conduct.

The court instructed the jury that "willful" means "a purpose or willingness to commit the act or engage in the conduct in question, and the conduct was not reasonable under the circumstances then present and was not undertaken in good faith." Further, the court instructed the jury that "malice" means "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard for the rights of others when the defendant is aware [of] the probable consequences of its conduct and willfully and deliberately fails to avoid those consequences. Despicable conduct is conduct which is so vile and wretched that it would be looked down upon and despised by ordinary decent people." In addition, the court instructed the jury that a finding of willful and malicious misappropriation must be supported by clear and convincing evidence.

 Our Supreme Court has recognized that malice may be proven either expressly by direct evidence probative of the existence of hatred or ill will, or

by implication from indirect evidence from which the jury may draw inferences. (*Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 923, fn. 6 [148 Cal.Rptr. 389, 582 P.2d 980].)

Ajaxo argues that it presented evidence that following Ajaxo's presentation and explanation of how to handle "cookies" to Baca, Baca met with Everypath. Within hours of this meeting, Everypath embarked on a crash development of "cookies" to support its wireless proxy. Everypath learned of Ajaxo's capabilities from Baca and changed its design to conform to the functional specifications that incorporated elements of Ajaxo's wireless proxy. Furthermore, Everypath prepared its proposal to E*Trade based on information and coaching received from Baca and Raymond after Ajaxo's proposal had been evaluated by them and Everypath was assisted in the development of its wireless proxy technology by Raymond. Ajaxo asserts that from this course of conduct it was certainly reasonable for a jury to infer that Everypath purposefully built and passed off as its own a technology it knew had been taken from someone else and thereby intended to cause injury to the true/owner developer of that technology.

We agree. Over many months, Everypath continued to develop a product with Baca's assistance and pass it off as its own technology; at the very least, the jury could have concluded that Everypath acted with a willful and conscious disregard for the rights of others. We agree with Ajaxo that it is reasonable for the jury to have concluded that this prolonged course of thievery is the type of " 'vile and wretched' conduct that would be 'looked down upon and despised by ordinary decent people.' "

With respect to willfulness, we find no evidence that Everypath engaged in this course of conduct with anything other than a willingness to take the information that Baca was providing them so that they might gain financially.

Giving full effect to all of Ajaxo's evidence and disregarding all of Everypath's evidence to the contrary (see *In re Mark L.* (2001) 94 Cal.App.4th 573, 580–581 [114 Cal.Rptr.2d 499]), we find substantial evidence of willful and malicious conduct on the part of Everypath in misappropriating Ajaxo's trade secret.[46]

With respect to ratification, ratification may consist of "accepting or retaining the benefit of the act, with notice thereof." (Civ. Code, § 2310.)

---

[46] On appeal, we must only find substantial evidence of the willful and malicious conduct. (*Crail v. Blakely* (1973) 8 Cal.3d 744, 750 [106 Cal.Rptr. 187, 505 P.2d 1027] [" 'The sufficiency of evidence to establish a given fact, where the law requires proof of the fact to be clear and convincing, is primarily a question for the [trier of fact] to determine, and if there is substantial evidence to support its conclusion, the determination is not open to review on appeal' "].)

In *Pusateri v. E. F. Hutton Co.* (1986) 180 Cal.App.3d 247, 251–253 [225 Cal.Rptr. 526], a retired couple placed $196,000 with a stockbroker. They informed him that they wished to invest in tax-free bonds and money market accounts to obtain a monthly income. Immediately, the broker commenced purchasing volatile stock, and ultimately, lost the couple approximately $100,000. The broker left the company, and the couple's account was assigned to another broker. Hutton's branch manager received regular monthly reports of the couple's account. (*Id.* at p. 252.) Eventually, when the couple found out that they owed the brokerage interest on a margin account they sued the brokerage. A jury awarded the couple punitive damages. The brokerage appealed. (*Id.* at p. 249.) On appeal, the First District Court of Appeal affirmed finding ratification based on the brokerage's *opportunity to learn of the misconduct and failure to investigate.* (*Id.* at p. 253.)

Here, Everypath hired Baca, the very person who had accessed Ajaxo's system without authorization. The testimony at trial was that Baca and Raymond were in constant contact with Everypath over a period of several months. In a very short space of time, Everypath's engineers knew how to handle the problem of "cookies." At a time when Everypath had just changed direction and "did not have a product . . . didn't have the business . . . didn't have a team," it is unreasonable to believe that Everypath's management did not have the opportunity to look into the source of the technology solutions its engineers "developed." In short, Everypath's management must have known the technology its engineers "developed" came about in too short a time for independent development. Yet they failed to investigate why it had happened. In short, at best, they "turned a blind eye" to what was happening.

Accordingly, we conclude that there was substantial evidence from which the jury could have concluded that Everypath's top management had the opportunity to know of and either ignore or actually approve of Baca's theft of Ajaxo's trade secret.

Finally, Everypath adopts by reference E*Trade's arguments in E*Trade's opening brief, to contend that the trial court's evidentiary rulings deprived Everypath of its right to a fair trial. We have disposed of this argument *ante.*

## *Disposition*

With respect to the trial court's grant of nonsuit on damages for misappropriation of Ajaxo's trade secret by E*Trade and Everypath, the judgment is reversed and the case is remanded to the trial court for a new trial on damages. In all other respects, the judgment is affirmed. The parties are to bear their own costs on appeal.

Rushing, P. J., and Premo, J., concurred.

A petition for a rehearing was denied January 12, 2006, and the petition of defendants and appellants for review by the Supreme Court was denied March 22, 2006, S140791. George, C. J., did not participate therein.