Filed 11/2/18

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JASON OLIVE,<br><br>　　Plaintiff, Appellant and Cross-<br>　　Respondent,<br><br>　　v.<br><br>GENERAL NUTRITION CENTERS,<br>INC.,<br><br>　　Defendant, Respondent and<br>　　Cross-Appellant. | B279490<br><br>(Los Angeles County<br>Super. Ct. No. BC482686) |

　　APPEAL from a judgment and order of the Superior Court of Los Angeles County, John Shepard Wiley, Jr., Judge. Judgment affirmed, order reversed.

　　Johnson & Johnson, Neville L. Johnson, Douglas L. Johnson and Ronald P. Funnell; Hamideh Firm and Bassil A. Hamideh for Plaintiff, Appellant and Cross-Respondent.

　　McGuire Woods, Leslie M. Werlin, James F. Neale and

Molly M. White for Defendant, Respondent and Cross-Appellant.

———————————

Jason Olive is a model and actor who contracted with General Nutrition Centers, Inc. (GNC) to use his likeness in its advertising campaign. GNC continued using Olive's likeness in its advertising after its right to do so expired. GNC admitted liability for the unauthorized use of Olive's likeness in violation of Civil Code section 3344[1] but contested the amount of damages. A jury found Olive suffered $213,000 in actual damages and $910,000 in emotional distress damages. The trial court denied both parties' motions for prevailing party attorney fees and costs.

Both Olive and GNC separately appeal from the judgment and the order denying prevailing party attorney fees. Olive contends the court erred by (1) failing to provide his proposed special jury instruction concerning the burden of proof under section 3344, (2) excluding his expert witnesses who would have testified about the amount of GNC's profits from the unauthorized use of his likeness, and (3) determining he was not the prevailing party for purposes of awarding statutory attorney fees. In its cross-appeal, GNC contends it should have been deemed to be the prevailing party.[2] We conclude the trial court

---

[1] The statute prohibits the knowing use of another person's likeness in any manner, including for the purposes of advertising, without such person's consent. (Civ. Code, § 3344, subd. (a).)

All undesignated section references are to the Civil Code.

[2] In its opening brief, GNC additionally claimed the trial court erred by denying its motion for judgment notwithstanding the verdict. GNC abandoned this claim in its reply brief, and we therefore do not address it.

2

abused its discretion in its determination that Olive was not the prevailing party; accordingly, we reverse the order denying Olive's motion for attorney fees. The judgment is affirmed.

## FACTUAL AND PROCEDURAL SUMMARY

*Olive's Background*

Olive is a model, former professional volleyball player, and actor. His previous modeling engagements included campaigns for Ralph Lauren, Levi's, Versace, Armani, Calvin Klein, Elle Magazine, and GQ Magazine. Olive reached the peak of his modeling career in the mid-1990's, when he was in his twenties. He earned up to $25,000 per day for modeling work during the height of his career.

Olive's modeling career has waned since that time, and he turned to acting around 2010. He was featured in Tyler Perry's hit television show "For Better or Worse" in 2011.

*GNC's New Marketing Campaign*

GNC is an international retailer and manufacturer of vitamins and other nutritional supplements, with approximately 8,000 retail locations. GNC has used the "Live Well" marketing tagline in its advertising and marketing materials since approximately 1998. The slogan is meant to encourage customers "to live a better life."

In 2010, GNC hired photographer Peter Arnell to carry out a photo shoot for its new "Live Well" advertising campaign. GNC was looking for models who were athletic, healthy, ethnically diverse, and "everyday relatable people." GNC gave Arnell a budget but otherwise had no direct role in the photo shoot, including casting and securing proper release agreements.

*Olive is Cast as a Model for GNC's "Live Well" Campaign*

Olive's agent, Richard Ferrari, submitted him as a candidate for GNC's "Live Well" campaign. Compensation for the photo shoot was posted at $6,000 but Ferrari sought a higher rate. Arnell had a limited budget and refused to negotiate for a higher fee. Olive and approximately 15 other models were cast for the photo shoot.

Olive executed a "Photograph and Likeness Release" on September 24, 2010. The agreement irrevocably granted GNC the "absolute right, permission, authorization and consent to use, reuse, produce, reproduce, exploit, publish, republish, display and otherwise use and reuse [his] image and likeness and photograph to be taken at the photoshoot scheduled for September 24, 2010." Olive was paid $4,000 for the three-hour photoshoot, in addition to an $800 agent fee. The release lasted for one year from GNC's first usage in print media, and GNC had the unilateral right to a one-year renewal in exchange for the same amount of compensation.

In November 2010, Olive executed a second "Photograph and Likeness Release" allowing GNC to use his image and likeness on print media displayed on any company trucks and other vehicles in North America. Olive was paid $8,000 for this agreement, which is valid through December 31, 2021.

GNC's marketing team approved Arnell's selections. GNC launched its new advertising campaign in January 2011. Olive's image was used in outdoor billboards, bus shelters, kiosks, social media websites, direct mail advertising, as well as in-store posters and signage. Olive was "shocked" and "angered" when he discovered the vast scope of the advertising campaign. Olive believed he agreed to "a very small job" in light of what he

perceived to be a small fee, and he felt he was doing a favor for the Arnell Agency.

In May 2011, GNC decided to pursue a new photo shoot in an effort to update its promotional graphics. GNC wanted its new approach to resonate with updates to its stores. None of the models from the September photo shoot, including Olive, were invited to the new shoot.

GNC terminated its relationship with the Arnell Agency after Arnell's principals divorced. GNC expected the agency would continue managing the models it used and maintain any outstanding release agreements. GNC did not immediately hire a replacement advertising agency, and no one was tasked with keeping track of model release agreements.

*GNC's Right to Use Olive's Likeness Expires*

GNC declined to renew the release agreement, and Olive told Ferrari he wanted to end his relationship with GNC. On January 9, 2012, Ferrari emailed GNC to confirm it was no longer authorized to continue using Olive's image.[3] He never received a response. Olive eventually fired Ferrari.

Celina Petronzi, an employee in GNC's marketing department, was tasked with responding to Ferrari's inquiry, but she failed to do so. Petronzi emailed GNC's Vice President of marketing, informing her that some talent from the September 2010 Arnell photo shoot was going to expire, and asking about

---

[3] It is unclear exactly when the release term expired. Olive contends the term expired at the end of November 2011, whereas GNC contends it expired "at the end of 2011." Nevertheless, it is undisputed that GNC's right to use Olive's likeness expired sometime in late 2011 or early 2012.

what imagery would be used going forward. The marketing department was unaware that the releases had expired and was not familiar with Olive.

After discovering the oversight, GNC negotiated extensions for every model used in the September 2010 shoot, except Olive. The company was prepared to replace the images of any model who "was difficult" during negotiation. GNC paid between $7,500 and $32,000 to the models in exchange for five-year extensions. GNC retained a new advertising agency in April 2012.

GNC continued its efforts to negotiate a release extension with Olive, but he refused and instead filed suit. Later in 2012, GNC attempted a last ditch effort to negotiate an extension with Olive for $150,000. Olive rejected the offer. GNC removed Olive's image from its marketing materials in either November or December of 2012, incurring approximately $350,000 in take-down expenses.

*Olive's Complaint and GNC's Answer*

Olive's complaint alleged causes of action for common law misappropriation of likeness and statutory misappropriation of likeness (§ 3344). He also sought restitution for unjust enrichment. Pursuant to section 3344, subdivision (a), Olive requested disgorgement of any profits from GNC's unauthorized use of his image. GNC initially denied Olive's allegations, but it admitted liability for the unauthorized use of Olive's image prior to trial.

*GNC's Motions In Limine*

Olive designated three experts to offer their opinions regarding GNC's profits attributable to its unauthorized use of

6

his image: (1) Weston Anson; (2) Leonard Lyons; and (3) Jeff Anderson. GNC moved in limine to exclude Anson and Lyons from testifying at trial.[4]

GNC sought to exclude Anson from opining as to Olive's damages and the apportionment of GNC's profits to its use of his image. The company argued Anson's opinions were speculative and unreliable. GNC also sought to exclude Lyons because his opinion was based on Anson's speculative and flawed analysis. Following a hearing, the trial court granted GNC's in limine motions to exclude Anson and Lyons.

*Jury Verdict and Judgment*

The jury ultimately awarded Olive a total of $1,123,000 in damages, consisting of $213,000 in actual damages and $910,000 in emotional distress damages. The jury found that Olive failed to prove any of GNC's profits were attributable to the unauthorized use of his image, and that GNC had not acted with malice or fraud. The trial court separately returned a defense verdict on Olive's equitable claim for unjust enrichment. The court denied GNC's motion for a new trial and for judgment notwithstanding the verdict on the jury's emotional distress damages verdict.

---

[4] Anderson is the Director of Valuation and Analytics at Anson's firm. GNC did not move to exclude Anderson as an expert. Olive contended at oral argument that he did not call Anderson as a witness because he had only generated data used by Anson.

*Motion for Attorney Fees and Costs*

Both parties moved for statutory prevailing party costs and attorney's fees pursuant to section 3344, subdivision (a). The trial court noted that both parties were visibly disappointed after the jury rendered its verdict. It found there was no prevailing party because "the jury accepted neither side's recommendation but instead awarded a middling sum amounting to a tie."

## DISCUSSION

A.   <u>The Trial Court Correctly Rejected Olive's Proposed Special Jury Instruction</u>

Olive contends the trial court erred by rejecting his proposed special jury instruction regarding the burden to apportion GNC's profits associated with the unauthorized use of his likeness. We disagree.

### 1. *Law Governing Jury Instructions and Standard of Review*

A party in a civil case is, upon request, entitled to correct jury instructions on every theory of the case that is supported by substantial evidence. (*Eng v. Brown* (2018) 21 Cal.App.5th 675, 704.) "It is elementary that a court may refuse a party's request for a jury instruction that misstates the law. 'A trial court has no duty to modify or edit an instruction offered by either side in a civil case. If the instruction is incomplete or erroneous the trial judge may, as he did here, properly refuse it.' [Citations.]" (*Ibid*; accord, *Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 685.)

An instruction that clarifies the application of statutory language may not add to the words of a statute. (*Torres v.*

*Parkhouse Tire Service, Inc*. (2001) 26 Cal.4th 995, 1003–1004.)
We review the legal adequacy of jury instructions under the de
novo standard of review.  (*Eng v. Brown*, *supra*, 21 Cal.App.5th at
p. 704.)

  *2.  Section 3344 and CACI No. 1821*

  In any action brought under section 3344, the injured party
is entitled to collect any profits that are attributable to the
defendant's unauthorized use of his or her likeness.  (§ 3344,
subd. (a).)  "In establishing such profits, the injured party or
parties are required to present proof only of the gross revenue
attributable to such use, and the person who violated this section
is required to prove his or her deductible expenses."  (*Ibid*.)

  CACI No. 1821 is the standard instruction for the jury to
determine damages arising from a statutory misappropriation of
likeness claim under section 3344.  Pertinent here, the
instruction provides:

  "In addition, [name of plaintiff] may recover any profits
that [name of defendant] received from the use of [name of
plaintiff]'s [name/voice/signature/photograph/likeness] [that have
not already been taken into account with regard to the above
damages].  To establish the amount of these profits you must:

> 1. Determine the gross, or total, revenue that [name of
> defendant] received from the use;
> 2. Determine the expenses that [name of defendant] had in
> obtaining the gross revenue; and
> 3. Deduct [name of defendant]'s expenses from the gross
> revenue.

9

[Name of plaintiff] must prove the amount of gross revenue, and [name of defendant] must prove the amount of expenses." (CACI No. 1821.)

### 3. *Olive's Proposed Special Instruction*

Olive initially requested the trial court include CACI No. 1821 in his proposed instructions. He correctly proposed that "Jason Olive must prove the amount of gross revenue, and GNC must prove the amount of expenses." Olive later moved to amend the instruction to additionally require GNC to prove "the portion of revenue that is attributable to factors other than the use of [Olive's likeness]" after the trial court granted GNC's in limine motions to exclude Anson and Lyons. Olive argued that without his proposed supplemental language, the jury would be confused about the burden to apportion profits and would misapply the law.

Following a hearing, the trial court denied Olive's motion. The court determined that section 3344 unequivocally placed the burden on Olive to present proof of GNC's gross revenue attributable to its use of his likeness. The court also rejected Olive's reliance on federal copyright law.

### 4. *CACI No. 1821 Tracks the Language of Section 3344*

Olive contends the court erred because CACI No. 1821 did not adequately explain the parties' respective burdens of proof under section 3344, thus necessitating a further instruction guiding the jury on how to arrive at damages for GNC's profits attributable to the infringement. He is incorrect.

The statutory language of section 3344 is unambiguous— the plaintiff bears the burden of presenting proof of the gross

10

revenue attributable to defendant's unauthorized use of the plaintiff's likeness, and the defendant must then prove its deductible expenses.  (§ 3344, subd. (a).)  CACI No. 1821 mirrors the language of section 3344: "[plaintiff] must prove the amount of gross revenue, and [. . . defendant] must prove the amount of expenses."  (CACI No. 1821.)

The special instruction proposed by Olive flips that statutory language on its head.  Under that instruction, GNC would have to prove the amount of its gross revenue not attributable to its use of Olive's likeness, a figure that could not be calculated without first determining the company's total gross revenue.  The remaining figure, of course, would be GNC's calculation of the amount of gross revenue that was attributable to its use of Olive's likeness.  Not only is this directly contrary to the unambiguous statutory command that Olive had to prove the amount of revenue attributable to GNC's use of his likeness, it would create the absurd result of effectively placing on each party the burden to prove the same disputed fact.

Therefore, contrary to Olive's contention, CACI No. 1821 adequately explained the applicable law to the jury.  It is elementary that a court may refuse a proposed instruction that incorrectly states the law.  (*Eng v. Brown*, *supra*, 21 Cal.App.5th at p. 704; *Bullock v. Philip Morris USA, Inc.*, *supra*, 159 Cal.App.4th at pp. 684–685.)  Moreover, a court may properly refuse a proposed instruction if other instructions given adequately cover the law.  (*Bullock*, at p. 685; *Arato v. Avedon* (1993) 5 Cal.4th 1172, 1189, fn. 11.)  The court was correct in rejecting Olive's proposed supplemental instruction as unnecessary and misleading.

11

Olive also supports his claim of instructional error by citations to federal copyright, patent and trademark law, pointing to the legislative history of section 3344, which he contends states: "The rationale for the right of publicity, namely the encouragement of personal achievement for the ultimate benefit of society, is closely analogous to the rationale for copyright protection under the U.S. Constitution."

We reject this comparison. First, Olive appears to cite to nothing more than the bill number of a 1984 amendment to the statute, and has not provided us with either a proper legislative history citation to the material he asks us to consider or a copy of the relevant document.

Second, as previously discussed, the language of section 3344 is clear and unambiguous. "[W]hen the words of a statute are unambiguous, we need not turn to any extrinsic sources. [Citation.]" (*City of Montclair v. Cohen* (2018) 20 Cal.App.5th 238, 250.) "In such a case, there is nothing for the court to interpret or construe. [Citation.]" (*MacIsaac v. Waste Management Collection & Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1082.) State courts of appeal will resort to federal law for guidance only in the absence of relevant state precedent. (*Stephen v. Enterprise Rent-A-Car* (1991) 235 Cal.App.3d 806, 814.)

Section 3344 could not be clearer as to which party bears the burden to prove GNC's profits attributable to the unauthorized use of Olive's image. Accordingly, we need not turn to any extrinsic sources on this point.[5] As a result, we follow

---

[5] In arguing that he was prejudiced by the allegedly erroneous jury instruction, Olive relies on two questions from the jury. First, the jury asked the court "what are the guidelines for

12

theplain meaning of the statute without resorting to its legislative history. (*N.S. v. D.M.* (2018) 21 Cal.App.5th 1040, 1047.)

Third, even if the Legislature believed that the *rationale* supporting the right of publicity was analogous to the rationale for copyright protection, it was still free to enact a law that deviated from its federal counterpart. "Our role in construing a statute is simply to ascertain and to declare what is in terms or in substance contained in the statute, not to insert what has been omitted." (*Esberg v. Union Oil Co.* (2002) 28 Cal.4th 262, 270, citing Code. Civ. Proc., § 1858.)[6]

---

determining profit damages and the amount[?]" The court responded by circling the word "profits". Second, the jury indicated it "has concerns about the profit that GNC made, and that we cannot figure out the formula for an amount even though we agree that GNC made money off of his image, could someone help us through the problem?" In response, the court reopened closing argument, allowing each party to argue for an additional five minutes. Having concluded there was no instructional error, we need not address Olive's argument regarding prejudice. (E.g., *Center for Biological Diversity v. County of San Bernardino* (2016) 247 Cal.App.4th 326, 332.)

[6] Olive also repeatedly cites *Christoff v. Nestle USA, Inc.* (2007) 152 Cal.App.4th 1439 for this proposition, even after acknowledging that it was superseded by the Supreme Court's grant of review and subsequent reversal on other grounds in *Christoff v. Nestle USA, Inc.* (2009) 47 Cal.4th 468. California Rules of Court, rule 8.1115 prohibits the citation of unpublished California state opinions, with certain limited exceptions inapplicable here. (Cal. Rules of Court, rule 8.1115(a); *People v. Gray* (2014) 229 Cal.App.4th 285, 292, fn. 15 [improper to cite or rely upon an unpublished opinion].)

Finally, Olive contends that CACI No. 1821 did not give the jury adequate guidance as to the meaning of the term "attributable to" when determining the amount of gross revenues derived from GNC's use of Olive's likeness. The term "attributable" means "capable of being attributed." (Webster's Third New Internat. Dict. (1993) p. 141, col. 3.) When used as a verb, "attribute" simply means "explained as caused or brought about by; regard as occurring in consequence of or on account of . . . ." (*Id.*, p. 142, col. 1.) In short, when something is attributable to an act, it is caused by or results from that act, a common definition that squares with the language of section 3344. We therefore see no error in that regard either.

## B.     Exclusion of Olive's Expert Witnesses

Olive contends the court erred in two respects when it excluded Anson and Lyons from testifying as experts at trial. First, the exclusion of these experts hinged on a misapplication of section 3344, requiring that he prove GNC's profits from the unauthorized use of his image. Having already concluded the trial court did not misinterpret the burden of proof set forth in section 3344, we will not revisit this claim. Second, Olive asserts the exclusion of Olive's proposed expert witnesses was an abuse of the court's discretion.

### *1. Applicable Law and Standard of Review*

In the context of admitting expert testimony, our Supreme Court has explained that trial courts "have a substantial 'gatekeeping' responsibility." (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 769 (*Sargon*).) That is, "under Evidence Code sections 801,

14

subdivision (b), and 802, the trial court acts as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or 3) speculative." (*Id*. at pp. 771–772; accord, *Cooper v. Takeda Pharmaceuticals America, Inc*. (2015) 239 Cal.App.4th 555, 577 (*Cooper*).)

"'"[E]ven when the witness qualifies as an expert, he or she does not possess a carte blanche to express any opinion within the area of expertise. [Citation.] For example, an expert's opinion based on assumptions of fact without evidentiary support . . . or on speculative or conjectural factors . . . has no evidentiary value . . . and may be excluded from evidence. [Citations.]" [Citations.]'" (*Cooper, supra*, 239 Cal.App.4th at p. 577.) The court's gatekeeper function allows it to conclude there is simply too great an analytical gap between an expert's data and the opinion proffered, and thus exclude it as speculative or irrelevant. (*Sargon, supra*, 55 Cal.4th at p. 771; *David v. Hernandez* (2017) 13 Cal.App.5th 692, 698.)

However, "[t]he court must not weigh an opinion's probative value or substitute its own opinion for the expert's opinion. Rather, the court must simply determine whether the matter relied on can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture." (*Sargon, supra*, 55 Cal.4th at p. 772.)

A ruling will be deemed an abuse of discretion only if it is "'so irrational or arbitrary that no reasonable person could agree with it.' [Citation.] But the court's discretion is not unlimited, especially when, as here, its exercise implicates a party's ability to present its case. Rather, it must be exercised within the

15

confines of the applicable legal principles." (*Sargon*, *supra*, 55 Cal.4th at p. 773.)

In *Sargon*, *supra*, 55 Cal.4th 747, a small dental implant company that had net profits of more than $100,000 in 1998 sued the University of Southern California for breach of contract after the university failed to present proper reports as its contract required. (*Id*. at p. 754.) The company sought damages for lost profits ranging from $200 million to more than $1 billion. (*Id*. at pp. 753, 755.) Following an evidentiary hearing, the trial court excluded as speculative the proffered testimony of an expert who would have opined that but for the university's breach of contract, the company would have become a worldwide leader in the dental implant industry. (*Id*. at p. 753.)

The Court of Appeal reversed, concluding that the trial court erred in excluding the expert's testimony, but the Supreme Court reversed the judgment of the Court of Appeal. (*Sargon*, *supra*, 55 Cal.4th at p. 753.) Our high court held that trial courts have the duty to act as a "gatekeeper" to exclude speculative expert testimony. (*Ibid*.) Although lost profits need not be proven with mathematical precision, they must also not be unduly speculative; thus, the trial court acted within its discretion when it excluded the expert's opinion that the company would have become extraordinarily successful had the university completed the clinical testing. (*Ibid*.) The expert's opinion was unreliable because he did not base his lost profit estimates on a market share ever achieved by the company. (*Id*. at p. 776.)

2. *Proceedings Below*

Olive intended to offer Anson as an expert to opine about his actual damages and the apportionment of GNC's profits

16

attributable to its unauthorized use of his likeness. Olive designated Lyons as an expert regarding (1) the calculation of GNC's revenues, expenses and profits, (2) to conduct an apportionment analysis, and (3) to testify about the indicia of fraud or intentional misconduct by GNC.

GNC moved for an order in limine to preclude Anson from testifying, arguing his opinions were speculative, and lacked foundation and an objective methodology. GNC moved to exclude Lyons' testimony on the ground that it relied on Anson's flawed and speculative analysis, and that his opinion relating to GNC's indicia of fraud or intentional misconduct invaded the province of the jury.

The court determined that both Anson and Lyons utilized a "nearly data free and methodologically primitive" analysis. The court said that their methodologies contained no science or data, and instead simply relied on mere wishful thinking. The court granted the motions to exclude both witnesses.

Olive requested reconsideration of the motion in limine rulings. The court denied the motion. Olive then filed a petition for writ of mandate challenging the trial court's ruling. This court summarily denied the petition.

### 3. Anson's Testimony Was Properly Excluded

GNC's revenue in 2012 was approximately $2.4 billion. Pertinent here, Anson opined that one to three percent of GNC's revenue was attributable to the unauthorized use of Olive's likeness.[7] Anson's opinion was based on (1) an analysis of

_____

[7] Anson also concluded that Olive's actual damages for GNC's use of his likeness were between $500,000 and $1 million for 2012, and $1 million for 2013 based on (1) Olive's statement

17

purportedly comparable samples of comprehensive royalty agreements with various well-known celebrities, (2) the CEO's statement that in-store merchandising impacts the company's sales by zero to one percent, and (3) GNC's increase in revenue during the subject period of time. We agree with the trial court that his methodology was flawed in several aspects.

First, Anson based his opinion on a comparison of royalty agreements with various celebrities, athletes, and other persons of international prominence. These included Joe Namath, George Foreman, Kathy Ireland, Paris Hilton, Barry Bonds, Michael Jordan, Evander Holyfield, Tim Duncan, John Elway, Alex Rodriguez and Tyra Banks.[8] Intending no disrespect to Olive, nothing in the appellate record indicates that he shared anywhere near the same degree of celebrity as those included in Anson's sample.

In any event, Anson's methodology was also unsound because it compared the limited use of Olive's image from one photo shoot to comprehensive royalty agreements that included the licensors' name, signature, voice, initials, endorsement, and copyrights. Anson believed that GNC's sales increase was "driven by the face of the brand and a spokesperson [Olive] that's finally resonated with everyone." The fatal flaw in Anson's

_____

that he would not have accepted any less compensation, (2) Ferrari's testimony that Olive's minimum acceptable fee would have been in the "high six figures," and (3) the earnings of top male models published in a Forbes magazine article. Olive does not challenge the exclusion of Anson on this basis.

[8] The median compensation for an endorsement was five percent, but Anson believed one to three percent would be a more conservative figure as applied to Olive.

18

analysis is that, unlike the licensors in his sample, Olive was *not* the company spokesperson, and the use of images taken from a photo shoot with 15 other models is in no way analogous to a comprehensive celebrity endorsement arrangement.  An expert may not base his or her opinion upon a comparison of matters that are not reasonably comparable.  (See *Sargon*, *supra*, 55 Cal.4th at pp. 770; see also *Roscoe Moss Co. v. Jenkins* (1942) 55 Cal.App.2d 369.)

Second, Anson's analysis mischaracterized a statement from GNC's President and CEO, Joe Fortunato.  In his deposition, Fortunato was asked what percentage in-store marketing contributes to company sales.  He answered "it has the least amount of value of anything I've told you in regards to whether a consumer buys a product."  When asked to give a percentage, Fortunato responded: "I can put it at anywhere from zero to slightly more than zero.  Very little. [¶] . . . [¶] I'll go zero to one."

Anson cited this testimony to support his conclusion that at least one percent of GNC's revenues came from its unauthorized use of Olive's image.  Olive asserts in his opening brief that "Fortunato admitted that the Live Well marketing campaign drove 1 percent of GNC's revenue."  Fortunato's testimony did not apportion between the Live Well campaign and any other forms of in-store marketing.  Neither did he attribute any portion of his estimate to Olive alone, as opposed to the other models used in that campaign.  In short, he made no such admission.  Anson's reliance on Fortunato's out-of-context statement further diminished the reliability of his analysis.

Third, Anson found a causal connection between GNC's annual growth rate and its unauthorized use of Olive's image

without identifying any reliable evidence linking the two, such as data from a focus group. Anson's analysis did not consider the macroeconomic conditions during the relevant period of time, GNC's pricing promotions, general sales in the vitamin and supplement industry, employee sales promotions, GNC's other marketing efforts, and the impact of professional athletic "ambassadors" used by GNC. Anson's conclusory analysis was therefore unduly speculative.

In sum, Anson's opinion hinged on hypothetical conjecture about GNC's profits attributable to Olive's image and would not have reasonably assisted the jury in evaluating the issue. (*Sargon*, *supra*, 55 Cal.4th at pp. 770, 777.) We agree with the trial court's conclusion that there was simply too great an analytical gap between the supposed data relied on by Anson and the opinion proffered. (See *id*. at p. 771 [court may conclude there is too great an analytical gap between the data and the opinion proffered]; see also *David v. Hernandez*, *supra*, 13 Cal.App.5th at p. 698 [same].) Thus, the court acted well within its gatekeeper's discretion by excluding Anson from testifying as an expert.

### 4. *Lyons Was Properly Excluded*

Lyons offered his opinion to quantify Olive's damages, and to prove that GNC intentionally continued using Olive's image after the release agreement expired. His calculation of Olive's actual damages directly hinged on Anson's determination that one to three percent of GNC's 2012 sales was attributable to the unauthorized use of Olive's likeness. Lyons admitted he did not conduct his own calculations "because they [Olive's counsel] retained an expert that had a long track record and is well-known

20

in branding and licensing and valuation of intellectual property rights. [¶] And I met with him and reviewed the work that he did, so I would feel comfortable with it."

GNC moved to exclude Lyons, arguing that his calculations hinged on Anson's invalid approach and that his assessment about indicia of fraud on the part of GNC was not the proper subject of expert testimony. The court granted the motion. It found that Lyons' opinion regarding Olive's damages was directly tethered to Anson's calculations and was likewise inadmissible. Further, the issue of whether GNC intentionally used Olive's image without authorization was beyond the scope of expert testimony.

Olive contends "[t]he trial court's lack of an independent review of Lyons' testimony again reveals that it did not conduct a causal nexus test.[9] Because the trial court did not analyze the experts' testimony in this fashion, and relied on a misinterpretation of section 3344, its rulings should be reversed."[10] We disagree.

---

[9] Olive repeatedly asserts that a claim under section 3344 requires a "causal nexus" between the defendant's unauthorized use of the plaintiff's image and the defendant's gross revenue. The statute does not use this phrase and, as discussed *ante*, the federal authority relied upon by Olive to support this contention is inapplicable to this case.

[10] Olive generally challenges the exclusion of Lyons but he does not specifically address Lyons' proffered expertise as to whether GNC's unauthorized use of Olive's likeness was intentional or malicious. It is his burden to assign a distinct claim of error. (*Salas v. Department of Transportation* (2011) 198

In his deposition, Lyons testified Anson was exclusively tasked with calculating the portion of GNC's revenues attributable to the unauthorized use of Olive's likeness. Lyons was unaware how Anson selected the comparable sample, and he did not independently evaluate whether the sample was appropriate. In particular, Lyons did not ask Anson how he ruled out other persons in his sample, nor did he ask about the parameters for his sample database. Notwithstanding these gaps in information, Lyons was "very comfortable" with the manner in which Anson conducted his analysis.

Anson planned to provide Lyons an attribution percentage for him to perform a damages calculation. Lyons's evidence that GNC's unauthorized use of Olive's likeness increased its sales was "that their sales went up significantly more, as a percentage, than they did in the prior year, . . ." Lyons offered no compelling evidence supporting his conclusion that Olive's likeness directly caused an increase in GNC's sales.

Expert opinion testimony may be based upon information furnished to the expert by others so long as the information is of a type reasonably relied upon by professionals in the relevant field. (*Korsak v. Atlas Hotels, Inc.* (1992) 2 Cal.App.4th 1516, 1524; *Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1135.) However, when the expert's opinion is not based on his own perception or knowledge, but depends instead upon information furnished by others, it is of little value unless the source is reliable. (See *Korsak*, at p. 1524, citing 1 Witkin, Cal. Evid. (3d ed. 1986) § 477, p. 448.) Thus, expert opinion testimony may not be based upon information furnished

Cal.App.4th 1058, 1074.) We therefore deem the issue forfeited. (*Ibid*.)

by others that is speculative, conjectural or otherwise unreliable. (*Ibid*; *Lockheed Litigation Cases* (2004) 115 Cal.App.4th 558, 564.)

As discussed, Lyons' opinion hinged on Anson's speculative assumptions with no independent evidentiary value. His opinions were unreliable on this basis. (See *Cooper*, *supra*, 239 Cal.App.4th at p. 577 [expert opinion based on speculative factors has no evidentiary value and may be excluded]; see also *Korsak v. Atlas Hotels, Inc.*, *supra*, 2 Cal.App.4th at pp. 1524, 1527 [excluding expert opinion where basis of opinion is unreliable hearsay].) The court properly excluded Lyons' speculative opinions. (See *Sargon*, *supra*, 55 Cal.4th at p. 772 ["goal of trial court gatekeeping is simply to exclude 'clearly invalid and unreliable' expert opinion"]).[11]

## C. Prevailing Party Attorney's Fees and Costs

Olive contends the trial court abused its discretion by denying his motion for prevailing party attorney fees. GNC contends that given the mixed results at trial, the court correctly concluded there was no prevailing party, and that alternatively, this court should deem GNC to be the prevailing party. We conclude that even under an abuse of discretion standard of review, it was unreasonable to conclude that Olive was not the prevailing party.

---

[11] Olive again cites the two jury questions about how to apportion GNC's ill-gotten profit in support of his contention that the court's exclusion of Anson and Lyons was prejudicial. Having found no error, we need not address this issue. (*Ante*, fn. 5.)

*1. Proceedings Below*

Olive's complaint alleged misappropriation of his likeness and sought restitution for GNC's unjust enrichment. GNC initially denied Olive's allegations but it eventually admitted liability for using his likeness without authorization. GNC made pre-trial offers to compromise in the amounts of $65,000, $150,001, and $200,000.

During closing argument, Olive sought actual damages of $500,000 to $1 million, a claw back of profits attributable to the unauthorized use between $11,745,580 on the low end and $35,236,740 on the high end, and emotional distress between $500,000 and $1 million. GNC impliedly recommended actual damages of no greater than $4,800, and explicitly recommended no emotional distress damages or profits attributable to the unauthorized use.

The jury found Olive was entitled to $213,000 in actual damages and $910,000 in emotional distress damages. The jury also found Olive failed to prove any of GNC's profits were attributable to the unauthorized use of his image, or that GNC acted with malice or fraud for the purpose of punitive damages.

Both parties sought prevailing party costs and attorney's fees pursuant to section 3344. The trial court concluded that neither party prevailed because "the jury accepted neither party's recommendation but instead awarded a middling sum amounting to a tie." In reaching this decision the court noted that both parties were visibly dismayed by the jury verdict—Olive thought it was too low and GNC thought it was too high. The court emphasized counsel's reactions, stating "[t]his . . . mutually transparent display was unprecedented in the court's experience."

The court continued: "Draw a line between two endpoints. The left endpoint is GNC's jury recommendation: $4800. The right endpoint is Olive's recommendation: $23.5 million. (His total recommendation actually was higher, but we simplify for clarity.) Now mark million-dollar intervals on this line, from left to right. This line charts the range of the quantitative dispute. Finally, place a fulcrum under this line at the $1.1 million point. That was the jury verdict. If this line were a tangible yardstick and the verdict an actual fulcrum, the yardstick would tilt sharply in GNC's favor. [¶] Think of a teeter totter. Olive is in one seat. GNC is in the other. The pivot point is the jury verdict. The seesaw's pivot is far closer to GNC than to Olive. [¶] According to the goal Olive set for himself, one cannot say Olive prevailed. He lost, which is why he and his team thought he lost. [¶] . . . [¶] GNC also thought it lost, and for good reason. In addition to an actual damage award that vastly exceeded GNC's assessment, the jury awarded Olive $910,000 in emotional distress damages. The GNC lawyers were plainly shocked by this pain and suffering sum."

### 2. Applicable Law

Generally speaking, parties to litigation must bear their own costs, including attorney fees. (*Westamerica Bank v. MBG Industries, Inc.* (2007) 158 Cal.App.4th 109, 125–126.) However, section 3344 mandates an award of attorney's fees for "[t]he prevailing party in any action under this section." (§ 3344, subd. (a); *Kirby v. Sega of America, Inc.* (2006) 144 Cal.App.4th 47, 62.) The statute does not define the phrase "prevailing party."

"'In the absence of legislative direction in the attorney fees

25

statute, the courts have concluded that a rigid definition of prevailing party should not be used.  [Citation.]  Rather, prevailing party status should be determined by the trial court based on an evaluation of whether a party prevailed "'on a practical level,'" and the trial court's decision should be affirmed on appeal absent an abuse of discretion.'  [Citation.]  'Among the factors the trial court must consider in determining whether a party prevailed is the extent to which each party has realized its litigation objectives.  [Citations.]'  [Citation.]"  (*Sharif v. Mehusa Inc.* (2015) 241 Cal.App.4th 185, 192 [when there are two fee shifting statutes in separate causes of action, there can be different prevailing parties].)

In the related context of determining whether there is a prevailing party on a contract, the trial court shall "compare the relief awarded on the contract claim or claims with the parties' demands on those same claims and their litigation objectives as disclosed by the pleadings, trial briefs, opening statements, and similar sources."  (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 876.)  The prevailing party determination is made based on a comparison between the extent to which each party succeeded and failed in its contentions.  (*Ibid.*)

### 3.  *Olive Was the Prevailing Party*

Olive achieved an undeniable victory on his section 3344 claim: a $213,000 verdict for actual damages versus the $4,800 verdict proposed by GNC; and $910,000 in emotional distress damages versus GNC's recommendation of zero damages.  By contrast, GNC prevailed by defeating Olive's demand for unauthorized profits under section 3344, subdivision (a).

26

We understand the trial court's conundrum: there was a wide disparity between where each party began and ended in terms of the relief sought and the relief obtained. The net result could be considered a draw, leaving each party dissatisfied with the result. However, we do not believe that means Olive was not the prevailing party simply because he failed to obtain an award for the most lucrative portion of his sought-after damages.

Although the source of attorney fees in this case is statutory, not contractual, we find analogous the reasoning of contract-based fee decisions.

"If the results in a case are lopsided in terms of one party obtaining 'greater relief' than the other in comparative terms, it may be an abuse of discretion for the trial court not to recognize that the party obtaining the 'greater' relief was indeed the prevailing party." (*de la Cuesta v. Benham* (2011) 193 Cal.App.4th 1287, 1295; accord, *Silver Creek, LLC v. BlackRock Realty Advisors, Inc.* (2009) 173 Cal.App.4th 1533, 1541 [prevailing party is the party who recovered "greater relief" on the contract].) Such is the case here, as Olive clearly obtained the greater relief.

The fact that Olive received substantially less damages than what he sought does not defeat his prevailing party status because a complete victory is not required. (See *de la Cuesta*, *supra*, 193 Cal.App.4th at p. 1296, fn. 5.) As articulated by the Fourth District Court of Appeal: "Most of the time, attorneys have an incentive to assert the maximal claims possible on behalf of their client. . . . But if anything less than complete victory means that a client loses what would otherwise have been 'prevailing party' status under section 1717, the attorney is crunched into a dilemma. Risk a malpractice suit by not

27

asserting maximal claims, or risk a malpractice suit by forfeiting 'prevailing party' status under section 1717 *by* asserting maximal claims." (*Ibid*.) "If anything short of 'complete victory' allows the trial court unrestricted freedom to ignore the *substance* of a result, then trial courts have the freedom to nullify the normal expectations of parties who [litigate statutes] with prevailing party attorney fee clauses." (*Id*. at p. 1295.)

*Ajaxo, Inc. v. E\*Trade Group, Inc.* (2005) 135 Cal.App.4th 21 (*Ajaxo*) is instructive. The case involved litigation between three companies in which E\*Trade breached a nondisclosure agreement, causing the release of Ajaxo's trade secrets. (*Id*. at p. 25.) Ajaxo sought lost profits of $19.2 million, but it ultimately received an award of $1.29 million in restitution. (*Ajaxo, supra*, 135 Cal.App.4th at pp. 25, 55, 59, & fn. 35.) The trial court deemed Ajaxo to be the "prevailing party" despite the fact that four of its theories of liability were rejected, it failed to secure a permanent injunction, and it received only a fraction of the damages it sought. (*Id*. at pp. 58–59, & fns. 34–36.) The Court of Appeal affirmed the prevailing party determination on the grounds that the victim company received a "simple, unqualified verdict on the breach of contract claim," along with damages in excess of $1 million. (*Id*. at p. 59.)

In *Silver Creek, supra*, 173 Cal.App.4th 1533, the parties executed agreements to purchase two commercial properties for $29.75 million, with $1.13 million deposited into escrow accounts. The deal fell through during escrow, and the seller sought a declaration that it validly terminated the agreements and was entitled to retain the deposit. (*Id*. at p. 1536.) The buyer cross-complained. (*Ibid*.) The trial court found in favor of the seller on the complaint and the cross-complaint, but concluded the buyer

was entitled to a return of the deposit.  (*Id*. at p. 1537.)  It determined there was no prevailing party because each party won one of the claims.  (*Id*. at p. 1540.)

The Court of Appeal in *Silver Creek* reversed, concluding the trial court's approach "oversimplified its duties by counting the number of contract claims presented and essentially declaring a tie because each party won one of the claims presented for resolution."  (*Silver Creek*, *supra*, 173 Cal.App.4th at p. 1540.)  The seller had achieved its main litigation objective in terms of monetary value—terminating the $29.75 million deal—even though the buyer retained the $1.13 million deposit.  (*Ibid*.)  Because the seller obtained the greater relief on the contract, the trial court abused its discretion by finding neither party achieved greater relief.  (*Id*. at p. 1541.)

In *de la Cuesta*, a landlord brought an unlawful detainer action and sought unpaid rent.  (*de la Cuesta*, *supra*, 193 Cal.App.4th at p. 1290.)  The tenant asserted she owed the landlord nothing because there were leaks in the premises.  (*Id*. at p. 1290.)  The day before the trial, the tenant vacated the premises, so the case proceeded to trial as to only the landlord's money claims.  (*Ibid*.)  The landlord recovered 70 percent of what he claimed was owing; nevertheless, the trial court ruled that there was no "prevailing party."  (*Ibid*.)  The appellate court reversed, concluding "[t]he result was *so* lopsided that, even under an abuse of discretion standard, it was unreasonable to say the landlord was not the prevailing party."  (*Ibid*.)

Like the victim in *Ajaxo*, Olive recovered less than 10 percent of the maximum damages sought.  And like the seller in *Silver Creek*, Olive clearly obtained the "greater relief" compared to GNC since he is walking away from the litigation with more

29

than $1 million.  Although the verdict was certainly lower than the amount sought by Olive and the percentage recovered by the landlord in *de la Cuesta*, it greatly exceeded GNC's damages recommendation of $4,800.  "It is not enough to hide the difference [between the amount sought and the total verdict] under the cover of an abuse of discretion standard." (*de la Cuesta, supra,* 193 Cal.App.4th at p. 1299.)  The fact that both parties were visibly disappointed by the verdict does not negate the fact that Olive prevailed on a "practical level."  Thus, Olive was entitled to attorney fees under section 3344.

## DISPOSITION

The order denying Olive's motion for prevailing party attorney's fees is reversed. The matter is remanded with directions to enter a new order declaring Olive to be the prevailing party on his section 3344 cause of action, and for further proceedings to determine an appropriate cost and fees award. The judgment is otherwise affirmed. Each party shall bear its own appellate costs. (Cal. Rules of Court, rule 8.278(a)(3) [costs are discretionary following partial reversal].)

<u>CERTIFIED FOR PUBLICATION</u>


MICON, J.*

We concur:


MANELLA, P. J.                    WILLHITE, J.


*Judge of the Los Angeles County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.